JOSIAH WHITESIDES, Administrator, Respondent, v. CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, January 5, 1915.

1. **RAILROADS: Failure to Give Statutory Signals: Persons Entitled to Invoke.** Certain considerations indicate that a person walking along a railroad track is not, if injured, by being struck by a train, entitled to invoke the failure to sound the bell or blow the whistle on the locomotive eighty rods from a road crossing, conformably to Sec. 3140, R. S. 1909, as a ground of recovery, but that such failure inures only in favor of persons using the crossing in connection with the use of the highway.

2. ———: ———: **Contributory Negligence.** Sec. 3140, R. S. 1909, enjoining the duty of sounding the bell or blowing the whistle on a locomotive eighty rods from a road crossing, supplies the causal connection between a failure to perform such duty and an injury to a person at the crossing; but contributory negligence on the part of the person injured will defeat a recovery.

3. ————: Injury of Pedestrian: Failure to Give Statutory Sig-
nals: Contributory Negligence.  In an action for the death of
a person walking along a railroad track, after dark, caused
by his being struck by a train at a road crossing, where it
was shown that decedent, a young man, possessed of all his
faculties, knew that the train was due to pass the point of
the accident about the time the accident occurred, and that
the train made such noise that a person who was six hundred
feet away heard it, and that decedent could have seen the train
when it was half a mile away, *held* that decedent was guilty
of contributory negligence as a matter of law, barring a
recovery for his death on the theory that the statutory sig-
nals were not given as required by Sec. 3140, R. S. 1909.

4. NEGLIGENCE: Last Chance Doctrine: Rationale.  The last
chance doctrine proceeds upon the theory that the negligence
of the person injured, in creating the situation of peril, was
remote in the chain of causation, and the omission of the
defendant to thereafter prevent injury to such person was the
proximate cause of the injury, where it appears that the situa-
tion of peril was discovered or was discoverable by the defend-
ant by exercising the requisite degree of care, in time to have
enabled him to avert the injury.

5. RAILROADS: Injury to Pedestrian: Last Chance Doctrine.
In order that a recovery may be had, under the last chance
doctrine, for the death of a pedestrian by being struck by a
train at a railroad crossing, it must be shown that decedent
was on the track or in a position of peril when struck, and that
the engineer could have seen him there, by the exercise of
ordinary care, at such a distance as to have enabled him to
avert the injury by prompt action with the means at hand
for that purpose, with safety to persons on the train.

6. EVIDENCE: Inference from Inference.  Although reasonable
inferences may be drawn from facts in evidence and utilized
in support of the verdict, other and additional inferences and
presumptions of fact based alone upon, or afforded by, prior
inferences cannot be utilized as evidence.

7. NEGLIGENCE: How Established: Evidence.  Negligence is a
positive wrong which must be established by facts and circum-
stances, including inferences, but cannot be presumed.

8. RAILROADS: Injury to Pedestrian: Evidence: Inferences.
The facts that a blood spot was found on the railroad track
at a highway crossing, that the skull of the deceased person was
crushed, his shoulder "caved in" and his hip injured, were
sufficient to warrant an inference that he was struck by a
train; and the fact that the body was found to the north of the

186MoApp39

blood spot warranted an inference that such train was north-bound, and decedent having been seen walking along the track a short while before a certain northbound train passed, an inference that such train caused his death was legitimate.

9. ——————: ——————: **Last Chance Doctrine: Sufficiency of Evidence.** In an action for the death of a person walking along a railroad track after dark, caused by his being struck by a train, evidence *held* insufficient to justify a finding that decedent was in a position of peril for a sufficient length of time to have enabled the engineer, by the exercise of due care, to discover him and prevent the accident by the use of the instrumentalities at hand for that purpose; the inferences relied upon by plaintiff to establish such facts resting, not upon facts, but upon other inferences, which is not allowable.

Appeal from Montgomery Circuit Court.—*Hon. James D. Barnett,* Judge.

REVERSED.

*O. M. Spencer, Ball & Ball, Palmer Trimble* and *M. G. Roberts* for appellant.

(1) Defendant's demurrers should have been sustained because there is a positive absence of any proof whatever showing the circumstances attending the accident. Proof that Whitesides, returning from a sojourn to a saloon and carrying two baskets of beer, was seen at Dyer's private crossing some time between 10 and 11 o'clock at night walking north along and on a straight railroad track, that on the next day at another crossing 800 feet further north his body was found by the side of the track with his skull crushed and his watch stationary at 10:59, and that one of defendant's fast passenger trains passed over that track shortly after 11 p. m., may be sufficient to warrant an inference that he was killed by a train, but does not justify or warrant a finding that the engineer's negligence under the last chance doctrine caused his death. Hamilton v. Railroad, 250 Mo. 722; Veatch v. Railroad, 145 Mo. App. 239; Davis v. Railroad, 155 Mo.

App. 314. (2) Mere concurrence of negligence and injury does not make the defendant liable. The duty to show by proof the direct connection of the alleged negligent act and the death is not affected by the humanitarian doctrine. Under that rule the plaintiff must show that the person killed could have been saved if defendant exercised ordinary care. While it may be proven by facts and circumstances, yet it cannot be proven by surmises, guesses, possibilities or by a process of reasoning whereby inference is built upon inference and conclusion upon conclusion. Koegel v. Railroad, 181 Mo. 379; Cahill v. Railroad, 205 Mo. 393; Giniochio v. Railroad, 155 Mo. App. 163; Glick v. Railroad, 57 Mo. App. 104. (3) Statutory public crossing signals are intended to be given and are only required for persons approaching the track along the highway and not to persons reaching the crossing by walking along the right of way. Burger v. Railroad, 112 Mo. 246; Degonia v. Railroad, 242 Mo. 592, 593, 594; Bell v. Railroad, 72 Mo. 58; Melton v. Railroad, — Mo. —; Evans v. Railroad, 62 Mo. 58. (4) George Whiteside's own negligence was so apparent, as a matter of law, that a recovery for failing to sound the whistle for the public crossing would not have been permitted, and the case was submitted on the last chance theory, of which the statutory crossing whistle is no part or element. Whiteside was informed by plaintiff's main witness that number 15 would soon pass, and with such knowledge the decedent proceeded to his mysterious death. It is not negligence to fail to give public crossing signals to those who know the train is approaching, as the sole purpose of giving such statutory signals is to furnish such knowledge. The law does not require statutory crossing signals to be given to trespassers, and Whiteside, while using defendant's right of way for his own convenience and reaching a public crossing as an incident to his progress along the right of way, was still a trespasser though killed at the

crossing.  Railroad v. McKnight, 166 Ill. App. 596; O'Donnell v. Railroad, 6 R. I. 211; Randall v. Railroad, 109 U. S. 478.

*S. S. Nowlin, Barclay, Fauntleroy & Cullen* and *Avery, Young, Dudley & Killam* for respondent.

NORTONI, J.—This is a suit under the wrongful death statute for damages accrued through the alleged negligence of defendant.  Plaintiff recovered and defendant prosecutes the appeal.

Plaintiff's decedent, George Whitesides, was run upon and killed on defendant's railroad track by its locomotive and train, on the night of August 15, 1910, at a point in Lincoln county, about 2287 feet north of Oasis station.  At the time of his death, Whitesides was an unmarried man, strong, robust, possessed of all of his faculties, and aged twenty-nine years.  Thereafter Josiah Whitesides, his father, was duly appointed administrator of his estate by the probate court of Lincoln county, and prosecutes this suit as such under the statute.  Although there is no evidence tending to prove that decedent was using the highway before the collision, it appears he was run upon by the engine while on the public crossing on the railroad; but evidently he came there after walking up the track between the rails—at least, all of the circumstances tend to so show the fact to be.  He was run upon, it is believed, somewhere about eleven o'clock at night by defendant's northbound fast passenger train, number 15, after having been last seen shortly before walking on the track to the northward, at a point about 635 feet farther south.

There is no direct evidence tending to prove the fact of collision, but it is to be inferred from a considerable blood spot on the railroad track, about the middle of the public road crossing, and the further fact that decedent's body was found the following

morning on the right of way west of the railroad and north of the road crossing, with his head crushed, one shoulder "caved in" and bruises on the hip.

It is argued the court should have directed a verdict for defendant because there is no evidence tending to prove the locomotive engineer was remiss in his duty in failing to observe decedent on the track in a position of peril in time to have averted the injury. On the other hand, it is urged that it was the duty of defendant to be on the lookout at the place for persons on the track, and that the engineer might have seen Whitesides walking northward between the rails for a sufficient distance to have enabled him to stop the train and avert a collision; also that defendant was remiss in its duty in failing to sound the statutory signal for the public road crossing where decedent was run upon. In the last analysis, the argument must be determined through reference to such legitimate inferences as are afforded by the meager facts in evidence, for the direct proof touching the real substance of the controversy— and that is relating to the position and conduct of the decedent, including the ability of the engineer to see and act in the premises for a moment or two before the collision—is slight, indeed.

It appears decedent lived with his father on a farm near to, but west of, the crossing of the public highway where he was run upon, and that he was entirely familiar with the railroad and the regular trains thereon. On the evening in question, he had made a trip to Old Monroe and returned to Oasis on defendant's train, number 7, about 10:15 o'clock at night, when he disembarked therefrom at the little station. The community is a rural one in the Mississippi river bottoms and adjacent to the neighboring bluff lands, about fifty miles north of St. Louis. Oasis station, maintained there by defendant, is a mere shelter for passengers, at which some of defendant's trains stop on signal for the accommodation of

the people of the neighborhood and also the patrons of several hunting and fishing clubs nearby. Number 7, the train on which decedent returned from Old Monroe, stopped at Oasis to permit him to alight therefrom, but number 15, the train which it is believed ran upon him, was a heavy passenger train which made no such stops—that is, it was a through train and not scheduled to stop at that station. There was no town or settlement immediately around the station, and the only approach thereto was by means of a private roadway running eastward over an embankment constructed through "Jake's pond" to a public highway farther east, running north and south and parallel with the railroad track. In this vicinity, the railroad was constructed along the Mississippi river bottoms by skirting the bluffs on the west. 2287 feet north of Oasis station, a public highway running east and west crossed the railroad, and it was on the crossing of this that decedent was run upon.

The railroad track was inclosed by a fence on either side, and the station house more or less inaccessible except from the east, from whence it is reached by means of the private road connecting with the public road running north and south, above referred to. The evidence tends to prove that, because of these facts, the people of the neighborhood had, ever since the station was established, used the railroad track for a distance of 2287 feet between Oasis station and the crossing of the east and west public road to the north as a passway to and from the station, and this was done with the forbearance and consent of defendant. This user of the tracks by the public, it appears, too, attended the situation in connection with the arrival of train number 7 about ten o'clock at night, for it appears persons returning home on that train, as decedent did, were wont to walk north, as he did, up the tracks to the public road crossing, although, of course, some of them left the station by means of the

private road to the eastward, before described. Train number 7 was due at Oasis at 9:51, but, on the night in question, it was late, and it appears decedent was permitted to alight therefrom at the station about 10:15. Number 15—that is, the through passenger train from St. Louis north—was due at the same station at 10:44 p. m., but, as before said, it was not scheduled to, and did not, stop there. However, this train, too, was late that night and appears to have passed Oasis at about 11:00.

On the arrival of train number 7, on which decedent returned from Old Monroe, he was met at Oasis station by one Ed Ferris, a colored work-hand in the employ of his father. Though Ferris worked on the farm of the elder Whitesides, it appears he resided at another place near by. Ferris says he had requested George Whitesides, decedent, to procure for him a quart of whiskey at Old Monroe and had awaited the coming of the train at the Oasis station in order to receive it. It appears that Ferris had received an injury to his foot that afternoon—that is, he had either sprained or broken it, as he says—and it was in such a condition as to be both painful and almost useless for the while. When decedent alighted from the train he carried two baskets, and it is said these were laden with bottles of beer to be used as a treat for the threshers. Ed Ferris met him at the station and the two sat down and talked for a considerable while. The time is not definitely stated, but Ferris insists that neither took a drink of the whiskey or the beer, and the evidence is, that decedent was not addicted to drink in the least. Indeed, the witnesses say he was a sober, industrious young man and all disclaim knowledge of his having taken a drink of intoxicating liquors in several years. While Ferris and decedent tarried at the station, it is said Ferris was nursing his swollen foot, until they finally started homeward up the track. Ferris walked with two sticks and decedent carried the

two baskets on his arm. The progress was slow, as Ferris said they "mosied" along; he, though using two sticks, would frequently stop in order to rest or nurse his aching foot and decedent would wait and attend him—that is, help him along. The two traveled north on the track as far as Dyer's private crossing, which is about 1500 feet north of Oasis depot and 785 feet south of the public road crossing farther north. Here they separated, for Ferris desired to go to his brother's house to stay over night, while decedent intended to go to the public road crossing 2287 feet north of the station and 785 feet north of where they then were, and thence west about a quarter of a mile to his father's home, where he resided. Shortly before parting, something was said between the two men concerning number 15, as if they thought it should pass ere long. On reaching Dyer's crossing, Ferris says decedent accompanied him to, and opened, the gate in the right of way fence on the west, so Ferris could pass through, en route to his brother's residence, whereupon decedent returned to the track and started north walking between the rails. Ferris says he "hobbled" slowly along in Dyer's orchard adjacent to the railroad for about ninety feet, when he stopped to rest his foot, looked toward the railroad and saw decedent going north on the track about "one telephone pole" —that is, about 150 feet—to the north of the point where he had left him. This appears to be the last time that decedent was seen alive, for those on the locomotive say they did not see him at all. At the time, decedent was about 635 feet south and walking on the track toward the road crossing, where he was afterward run upon. Ferris "crippled" on slowly through the orchard, and when he reached a point about 200 feet from the right of way gate, he both heard and saw defendant's train, number 15, approaching from the south, about 600 feet away. He says the train was running very fast and neither the whistle nor bell on

the locomotive was sounded at all. The track at the place in question was practically straight and the view open for almost a half mile south of the road crossing. The night was clear and Ferris says "moonshiny" and the locomotive was equipped with a headlight supplied with acetylene gas.

On the following morning, the body of decedent was found on the railroad right of way, lodged against the cattle-guard fence west of the tracks and north of the public road, as before stated, with evidences of collision about it, in that the skull was crushed, one shoulder "caved in," and one hip bruised. Moreover, a considerable blood spot was found on the railroad track near the west rail but about the center of the crossing of the public road.

It is argued that plaintiff made a prima-facie case for the jury through showing that decedent was run upon at a public road crossing because of the failure of defendant to sound the whistle or ring the bell attached to the locomotive—that is, give the statutory signal eighty rods before reaching the crossing—for it is said such conduct is negligence *per se*. Besides the considerations which point the statutory obligation to give signals on approaching the crossing of a public highway as one inuring only in favor of those persons using the crossing in connection with the use of the highway, it is to be said that plaintiff's right, in so far as this argument is concerned, is to be denied on the grounds of contributory negligence. Although through the omission of the signals required the statute supplies the causal connection between the injury and the remission of duty, the contributory negligence of the injured party may defeat the right of recovery if such appears. [See McGee v. Wabash R. Co., 214 Mo. 530, 544, 545, 114 S. W. 33; Maginnis v. Mo. Pac. R. Co., 182 Mo. App. 694, 165 S. W. 849.] Here decedent was a young man, possessed of all of his faculties, and entirely familiar with the situation as well as the

fact that number 15 was about due to pass that point. Whether the signals were given or not, the approaching train emitted noises which were heard by Ed Ferris 600 feet away. The view of the train was open and clear for a half mile south of the crossing, and, in any view of the case, decedent must be regarded as negligent in being upon the crossing immediately in front of a passing train in the circumstances disclosed by the record. It is believed the counsel fully recognized this to be true, for they seem to have abandoned that theory of the case on the trial and requested the court to submit it to the jury on the last clear chance doctrine alone.

But it is argued, though the judgment may not be sustained on the theory involved in the failure to give the statutory signal when approaching the crossing, there is enough in the evidence to support a recovery under the last clear chance rule. The last clear chance doctrine proceeds on the hypothesis that the injured party himself was negligently, or, it may be otherwise, as through misfortune, in a position of peril and that such peril was either discovered or discoverable by the defendant in exercising due care, in time to have averted the injury through utilizing the appliances at hand to do so. The rule is utilitarian in character, in that it proceeds according to the precepts of humanity to make for the safety of others in enjoining diligence on the part of one who may, by exercising care, avoid a hurt to another through the prompt employment of the appliances at hand and in the circumstances of the particular case. It therefore reckons with the negligent or other unfortunate situation of the party in peril as remote in the chain of causation and treats with the duty and its breach on the part of the person in charge of the dangerous instrumentality as the proximate cause of the injury, in those cases where it suf- ficiently appears the position of peril was ascertained or ascertainable through due care on the part of those

who ran upon him, in time to have prevented the injury through utilizing the means at command for that purpose in such a manner as not to injure others.

This being true, it must appear, not only that decedent was upon the track in a position of peril for a sufficient length of time when run upon, but that he was observable there by the engineer, while exercising due care to that end, for a sufficient length of time and at such distance to have enabled him to avert the injury through prompt action with the means at hand for that purpose and at the same time allowing for the safety of those on the train. Moreover, this much must appear from the facts and circumstances in evidence or the legitimate inferences therefrom, and this, too, without piling inference on inference, for such may not be allowed. In other words, though reasonable inferences may be drawn from facts in evidence and utilized in support of the verdict, other and additional inferences and presumptions of fact based alone upon, or afforded by, prior inferences may not be utilized as evidence, for such inferences are illegitimate. [See Hamilton v. Kansas City Southern R. Co., 250 Mo. 714, 157 S. W. 622.] Negligence is a positive wrong which must be established by facts and circumstances including inferences, but may not be presumed. [Witting v. St. Louis & S. F. R. Co., 101 Mo. 631-640, 14 S. W. 743.] No one saw decedent on the railroad track at the time he was run upon, but he was seen by Ed Ferris 635 feet south of the crossing, walking in the middle of the track northward toward the place where he met his death. This fact, when considered in connection with the further fact that a considerable blood spot was on the track in the center of the public road crossing, affords ample evidence, but through inference only, that he was upon the track when run upon, also that he was then—at that instant—in a position of peril. The fact of the blood spot on the crossing and the fact that decedent's skull was crushed and shoulder

"caved in" and an injury appeared on his hip are ample evidence, but through the inference they afford only, that he came to his death as a result of a collision with defendant's train. The fact that the body was thrown to the north and west of the blood spot on the track on the crossing is evidence, too, but only through inference thus afforded, that the train which ran upon him was northbound. From this it may be properly inferred that defendant's train, number 15, occasioned his death.

But after allowing these inferences and considering, too, that decedent was seen on the track "one telephone pole" north of Dyer's crossing not more than five or eight minutes before, can it be legitimately inferred that defendant's locomotive engineer could, by exercising due care, have seen him in a position of peril in time to have stopped the train and averted the injury from which he died? In this connection, the evidence is to be regarded as sufficient to establish a user of the track with a license on the part of defendant sufficient to affix the obligation on the part of its engineer to look out for pedestrians walking there. The engineer says he did not see a man on the track at all and had no knowledge of a collision until he was told about it afterward; but be this as it may, the case is to be viewed as though he could have seen decedent immediately before the collision by exercising care to that end. But when and where the engineer should have seen the decedent is another question and one concerning which we are not enlightened by the record. Defendant is presumed to have exercised due care unless the contrary is made to appear. Plaintiff introduced no proof tending to show either how far a man might have been seen by the engineer at the time or in what distance the train could have been stopped. The only evidence concerning these questions in the record is that given by defendant, to the effect that the train could have been stopped in not

less than 1200 to 1400 feet, and that a man on the track could have been seen by the engineer not to exceed 242 feet distant. It is obvious, therefore, the matter is to be ascertained from inference alone. It may be the jury could infer this train could have been stopped in a much shorter distance than that mentioned by the engineer and it may be that they could have inferred the engineer could see a man on the track quite beyond the distance he stated. But the subject-matter under consideration here pertains to the very gravamen of the charge of negligence laid and, as before said, defendant enjoys the benefit of the presumption afforded by the law to the effect that it exercised due care until the contrary is made to appear. The precise inference called for relates to the *position, or rather the place, of the man (that is, decedent) on the track in the instant case,* together with the ability of the engineer to see him there, for such is essential to the fact of negligence. The inferences that a man could have been seen on the track and the train stopped in time to have saved him arise, not from the established fact that decedent was on the track at any *given place,* but rather rest upon the inference that he was. The decedent was found to be upon the track through utilizing inferences from facts given in evidence and so being upon the track, through inference alone, another inference may not be rested thereon to the effect that he was there at some particular place and in view of the approaching engineer for a sufficient length of time to enable him to avert the injury by the use of the appliances at hand. Touching this matter, the legitimate evidence seems to be insufficient under the recent ruling of the Supreme Court in a similar case. [See Hamilton v. Kansas City, etc. R. Co., 250 Mo. 714, 157 S. W. 622.]

The judgment should be reversed. It is so ordered. *Reynolds, P. J.,* and *Allen, J.,* concur.