HENRY LOUISA STARKS, Respondent, v. JAMES W. LUSK, W. C. NIXON, and W. B. BIDDLE, Receivers of SAINT LOUIS and SAN FRANCISCO RAILROAD, Appellants.

Springfield Court of Appeals, June 26, 1916.

1. **RAILROADS: Injuries to Persons on Tracks: Review of Evidence: Sufficiency.** Action for death of plaintiff's husband killed by defendants' freight train while it was backing over a trestle. Plaintiff bases defendants' liability on the humanitarian doctrine in that defendants' servant whose duty it was to keep a lookout at the rear of the train while backing, failed to perform this duty, which if he had done the injury could have been averted. Evidence reviewed and deemed sufficient to warrant the jury in finding that deceased had passed the caboose and gone upon the trestle before the train backed up and that no trainman was at the rear end of the train who could or did look out for a clear track or take steps to avert danger.

2. **———: ———: Track Customarily Used by Pedestrians: Duty of Trainmen.** Action for death of plaintiff's husband occasioned by defendants' freight train backing on and running over deceased while crossing a trestle of defendants. On each end of the trestle was a sign "Keep off." Much switching was done at and near this point but there were no side tracks along this part of defendants' road. The evidence showed that for a long time the track and trestle had been used extensively by pedestrians, including children, many times each day, so much, in fact, that the ties were worn so as to show a distinct footpath. It was the duty of defendants' trainmen to anticipate and look out for persons on the track at this point.

3. **———: Injuries: Humanitarian Doctrine.** In an action against a railroad for damages because of the death of plaintiff's husband, in order to invoke the humanitarian doctrine it must be proven that the person in peril was visible by the trainmen while in peril, and that the fact of his peril was reasonably apparent in time to have averted the injury by the use of the means at hand.

4. **NEGLIGENCE: Contributory Negligence: Right to Recover Notwithstanding.** Though plaintiff's husband, who was killed by defendants' train backing on and running over him, may have been guilty of negligence and though such negligence may have contributed to the injury, yet if by the exercise of ordinary care defendants' servants could have discovered his peril and avoided the result, the negligence of the deceased is immaterial.

5. ———: Care Required Even as to Trespassers. Even as against a wrongdoer or a trespasser, ordinary care is a primary duty.

6. RAILROADS: Negligent Killing of Pedestrian on Track: Humanitarian Doctrine. The humanitarian doctrine is applicable in an action against a railroad for negligently backing its train upon and running over and killing plaintiff's husband who was crossing defendants' trestle where the evidence shows that deceased passed the caboose and went upon the trestle before the train backed up, that no trainman was at the rear end of the train to keep a lookout that the track was clear and avoid injury to anyone, that the trestle was regularly used by pedestrians and that the trainmen could, by due care, have seen deceased while in peril and realized the fact of such peril in time to have averted his injury.

7. ———: ———: Contributory Negligence: Humanitarian Doctrine. Under the facts stated, so far as defendant's duty to deceased is concerned, it is immaterial whether deceased was drunk or sober, walking along the track or sitting or lying down thereon.

8. DEATH: Damages: Amount Warranted. A recovery of $5000 was warranted in an action against a railroad for negligently killing plaintiff's husband, where it was shown that deceased was a farmer twenty seven years of age, in good health and that he left a wife and three children.

9. INSTRUCTIONS: Right to Request More Specific. Where either party, in an action for death on a railroad track, desires a more specific instruction as to what should be taken into account in determining the amount of the verdict, such party should request such an instruction.

Appeal from Stoddard County Circuit Court.—*Hon. W. S. C. Walker*, Judge.

AFFIRMED.

*W. F. Evans, Moses Whybark* and *A. P. Stewart* for appellants.

*K. C. Spence* for respondent.

STURGIS, J.—Plaintiff sued and recovered for the death of her husband by being run over and killed by defendants' freight train while backing over a trestle southwest of the station of Delta. The train in ques-

tion passed over this trestle, about 425 feet long, going north as it approached the station and, after stopping there, backed up in doing some switching so that the caboose again reached the south end of the trestle, furthest from the depot. The defendants' track runs northeast and southwest, but we speak of the directions as north and south, as did the witnesses. It was during this retrograde movement that plaintiff claims her husband was run down and killed near the south end of the trestle. Defendants' liability is based on the humanitarian doctrine in that defendants failed to have any person at the rear end of the train while backing to keep a lookout for or to warn persons of danger, or cause the train to stop after seeing a person in peril.

No one saw the accident, as deceased's body was found a corpse on the trestle some hours after this train had gone northward to Cape Girardeau. The trainmen deny any knowledge whatever of a man being killed till the same was reported to them after their arrival at such destination.

The deceased was killed about 7:00 or 7:30 o'clock in the afternoon of June 23, 1914, and in broad daylight. The track is straight from this trestle, and beyond, to the depot to the north and beyond. The depot is at the crossing at right angles of defendants' railroad and the Iron Mountain Railroad. The Cotton Belt Railroad parallels the Frisco and crosses the Iron Mountain a short distance to the east. Between these railroads and south of the depot is a camping ground, at and near which deceased was last seen alive. He went to this camp with his father and a number of friends who were to stay there during the night. According to plaintiff's evidence, the deceased shortly left this camp, going to the railroad and then south toward the trestle along the east side of the train while it was standing on the track opposite the camp, intending to cross over the trestle and visit a friend who lived somewhere beyond. This was the last time his father and friends at the camp saw him alive and his body was found some two hours later, badly mangled, on and near the south end of the trestle. The exact

distance of the defendants' depot from the trestle is not given, but it must be near a thousand feet, as the conductor said that his train contained twenty to twenty-three freight cars and when the engine stopped just beyond the depot the caboose was then past the trestle two or three car lengths. Other witnesses put the distance further. The camping place being nearer the depot than the length of the trestle, the deceased must have walked, in going from the camp to where he was found dead, some twelve to fifteen hundred feet. This is important as determining the correctness of the trainmen's story that the backing up movement of this train took place within a minute or two after the engine stopped at the depot and while the conductor was yet at the rear end of the train. More accuracy in respect to these distances would be helpful in solving this case. All of plaintiff's witnesses agree that the train came in while they were at the camp and came to a standstill at or before the deceased left the camp and started southward along the side of the train.

The plaintiff's theory is that the deceased, after going out of sight of his friends at the camp (being seen by them till he passed behind some cars standing on a connecting track between the defendant Frisco and the Cotton Belt roads and then going south along the side of defendants' train) continued south past the caboose and thence onto the trestle; that defendants' train then backed up without warning and with no one at the caboose on the lookout and that it caught deceased on the trestle when he was three-fourths of the way across. The conductor's version of the matter is that the train stopped with the engine at the depot and the caboose near the trestle; that it stayed there only a minute or two unloading a little freight; that he started at once to leave the caboose to go forward to the depot but had gotten not over a car length when the engineer whistled the backing up signal; that he ran back to the caboose step, gave the engineer the response signal to back up and then rode on this step to the beginning of the trestle and then stepped off after looking across the trestle and seeing that it was clear;

that the brakeman had already gone forward over the train; that the conductor then went forward to the depot and the train continued backing till the caboose reached about the far end of the trestle; that the engine then cut loose from the train, did some switching, and then coupled to the train and pulled out for Cape Girardeau, he and the brakeman catching the caboose as it went by the depot. In this the conductor is corroborated by the engineer. All the witnesses agree that there was but one backing up of the caboose and train across the trestle. The plaintiff's theory further is that the train stood still when the engine stopped at the depot and before backing up a considerable longer time than thus indicated by the trainmen and that the conductor, as well as the brakemen, went to the depot before the train began backing up, leaving no trainman at the caboose at the beginning or during the retrograde movement.

There is much evidence in plaintiff's favor on this point. A stockman remained in the caboose and testified strongly that the conductor and brakeman both left as soon as the train stopped and considerably before it backed up and that no trainman was in or about the caboose thereafter until the caboose passed the depot as it was leaving that station. He admits, of course, the possibility of the conductor standing beside the car or getting on the lower step without his having seen him. The deceased went down along the train on the same side that the conductor says he was on and the conductor did not see him pass the caboose, nor meet him further up. The conductor says that if deceased had passed beyond the caboose he would have seen him on the track or trestle, as the view was plain and open. The distance from where the deceased was last seen at the side of the train to the caboose or beyond was too great to be covered by deceased in the short time indicated by the conductor before it backed up. Other witnesses, including one of defendants' witnesses, said the train did considerable switching before it backed up and one of plaintiff's witnesses says he ate a lunch during this interval. Another witness testified

to seeing a young man answering the description of the deceased, though he had never seen deceased before nor did he see his body after his death, sitting on the end of a tie and leaning over the rail at a point between the caboose and the trestle. He said this man was much intoxicated and he caused him to get up and go down the dump for fear of his being run over by a train, but that the last he saw of him he was again going back on the railroad. The conductor was evidently then gone and says this incident must have happened after the train had backed up. It evidently was after he had left the caboose. The deceased had been drinking considerably during the day, but as to the extent to which his intoxication impaired his ability to care for himself varied considerably in the opinions of the different witnesses. According to his companions at the camp he had been drinking beer only and had not drank any for more than two hours; that deceased helped to take care of a team at the camp and walked around about as usual. Under the foregoing evidence we think the jury was warranted in finding that the deceased had passed the caboose and gone upon the trestle before the train backed up and that no trainman was then at the rear end of the train who could or did look out for a clear track or take steps to avert danger.

That deceased was killed by the train in question admits of little doubt and is practically conceded. When found deceaed was lying on his back east of the east rail and between it and the string of timbers fastened to the ends of the ties, known as the guardrail. This was a space of about sixteen inches. His right shoulder was against the rail, his right arm cut off at the shoulder and again at the wrist, and these parts were three or four feet from the body. A deep wound or hole was cut in the back of the head and other bruises were about the head and shoulders. N' other train had passed over this trestle from the time this one had backed thereon till the body was found.

The defendant insists that it was entitled to a clear track at this point and that it owed deceased no duty

whatever since none of the trainmen saw him in a place of danger. On this point it is shown that much switching has to be done at this meeting point of three railroads and that this trestle is within the designated yard and switch limits. There were, however, no side tracks along this part of defendants' road. It was also shown that warning or "keep off" signals were maintained at each end of this trestle. On the other hand it is alleged and shown that this part of defendants' track was much in use and had been for a long time by pedestrians going to and from the station of Delta. Many people used it regularly, including school children. One witness estimated that twenty-five to thirty people passed over it every day, and it was especially used in wet weather. So much had it been used as a footpath that the ties had been worn so as to show a distinct pathway. For a considerable number of people this was practically the only way to town and many others used it for greater convenience. The facts, we think, are sufficient to warrant the finding that defendants' trainmen were bound to anticipate, and to look out for, persons on the track at this point. [Murphy v. Railroad, 228 Mo. 56, 76, 84, 128 S. W. 481; Ahnefeld v. Railroad, 212 Mo. 280, 111 S. W. 95; Morgan v. Railroad, 159 Mo. 262, 60 S. W. 195; Fiedler v. Railway, 107 Mo. 645, 18 S. W. 847; Eppstein v. Railroad, 197 Mo. 720, 736, 94 S. W. 867.] Moreover the defendants' conductor said that the rules of the company required that in backing a train, as this one was, some employee be at the rear and on the lookout. Whether it would have been sufficient to discharge defendants' full duty in anticipating and looking out for the safety of persons who might be on this trestle, had the conductor stayed on the caboose, as he says he did, only till it was entering upon the trestle from which point he could see that the track was apparently clear and then leaving the caboose, is not before us since the jury was justified in finding that he did not even do this.

The defendants' main insistence is that there is no proof whatever that the deceased was, at the time and place of his death, in a position of peril such that

he and his peril could, by the use of due care, have been seen by those operating the train in time to have averted this accident. It is asserted, and properly so, that in order to invoke the humanitarian doctrine, it must be proven that the person in peril was *seeable* by the trainmen while in peril *and in time* to avert his injury by the use of the means at hand. This phase of the case is most strongly illustrated in Hamilton v. Railroad, 250 Mo. 714, 722, 157 S. W. 622 and Whitesides v. Railroad, 186 Mo. App. 608, 619, 172 S. W. 467. In each of those cases a person was found dead on or so near the railroad track and with such injuries as to warrant a finding that such deceased was struck by a train. In each case it was shown that there was a clear track for such distance beyond the point of injury that the person killed could, if he was then in the position where killed, have been seen in time to have averted the killing. The proof was lacking, however, in those cases, that the person killed was in fact at and in the danger zone when the train was far enough away to be stopped. In the Hamilton case, the court said: "In order to bring the case within the theory of the last clear-chance doctrine, it is necessary that there should be evidence, positive or inferential, that the deceased was upon the track, lying, standing or sitting for a time prior to the injury sufficiently long for actual or constructive sight by the persons in charge of the train and when it was at a distance sufficiently great to permit it to be stopped before striking him." And in the Whitesides case, this appears: "It therefore reckons with the negligent or other unfortunate situation of the party in peril as remote in the chain of causation and treats with the duty and its breach on the part of the person in charge of the dangerous instrumentality as the proximate cause of the injury, in those cases where it sufficiently appears the position of peril was ascertained or ascertainable through due care on the part of those who ran upon him, in time to have prevented the injury through utilizing the means at command for that purpose in such a manner

as not to injure others. This being true, it must appear, not only that decedent was upon the track in a position of peril for a sufficient length of time when run upon, but that he was observable there by the engineer, while exercising due care to that end, for a sufficient length of time and at such distance to have enabled him to avert the injury through prompt action with the means at hand for that purpose and at the same time allowing for the safety of those on the train.'' In those cases the difficulty lay in the fact that all that was proved was that deceased was, at the time he was injured, in the position of peril but there was nothing to prove how long he had been in that position. Although the place where he was injured was visible for a sufficient distance to allow a stop to be made or other precautions taken, yet there was no proof that the deceased was in that place, and therefore seeable there, long enough before the actual injury to have been seen by one looking at such place. In the instant case, however, we think such proof is supplied by the facts. This case differs in several respects from the two just cited. In both those cases the injury occurred at night when the range and clearness of vision was more restricted. Here the train was backing slowly and the conductor says it could have been stopped by him by applying the air brake within a few feet. This was an open trestle with nothing whatever to prevent the seeing of a man, or any object, at a considerable distance whether he be walking, standing, sitting or lying down. What is more important here is that deceased was necessarily in peril from the time the train entered on that trestle until it struck him, whether he was walking, standing, sitting or lying down and regardless of what part of the trestle he was on. He could have come onto the trestle nowhere but at the north end and, wherever he was between those points, and whatever doing, he was in peril. He was killed about 280 feet from where he entered into the place of peril and while the train was going that distance, at least, the deceased was seeable and was in a position of danger whatever he was doing or wherever

he was.  The train could have been stopped in much less distance.  The place where this deceased was killed, and for some distance on either side thereof, was not like the open roadbed in the Hamilton and Whitesides cases, where only a step or two in space and a moment of time separated the place of safety from the place of danger.  The conductor says that the deceased was not on the trestle when he stepped off the caboose as it entered thereon, because if he had been he could and would have seen him.  The trouble with this is that he was there, for how else could he get to the place where the train struck him?  And that the conductor did not see him is due to the fact, as the jury found, that he was not at the caboose looking but was up at the depot.  In Frick v. Railroad, 5 Mo. App. 435, 441, when no one was on the lookout at the rear of a backing train where persons might be expected on the track and the contributory negligence of the parents of a minor child killed thereby was pleaded, the court said: "It is immaterial, so far as the duty of a railway company to adopt precautions demanded by ordinary prudence as concerned, how the persons come there.  The well-settled rule as to contributory negligence is, that though the plaintiff has been guilty of negligence, and though such negligence may have contributed to the injury, yet if, by the exercise of ordinary care, the defendant could have avoided the result, the plaintiff's negligence is immaterial.  This doctrine rests upon the basis that he whose act is the efficient cause of the injury should be held liable; and that, even as against wrong-doers, ordinary care is a primary duty."

Under these facts, it is apparent that it would make little difference so far as defendants' duty to him is concerned whether deceased was drunk or sober, walking upright or with weaving tread, or, as is probable, was sitting or lying down in a drunken stupor.  [Murphy v. Railroad, 228 Mo. 56, 82, 128 S. W. 481; Bunyan v. Railroad, 127 Mo. 12, 29 S. W. 842; Riggs v. Railroad, 120 Mo. App. 335, 96 S. W. 707; Werner v. Railway, 81 Mo. 368.]  As said in the Murphy case,

supra, "For us to hold that there is no duty on railroad companies to look for any person except for those walking upright upon the track at places where there is a duty to see would be stumblingly narrow and sour exposition."

The plaintiff's principal instruction, the only one given as to the amount of damages recoverable, merely states that if the jury found the facts warranting a recovery, to "find a verdict for plaintiff in a sum not less than $2000 nor more than $10,000." The court refused to instruct on defendants' behalf "If you find the issues for plaintiff, you cannot assess her damages at more than the sum of $2000." The evidence showed that deceased was twenty-seven years of age, in good health, a farmer, and leaving a wife, plaintiff, and three children. These facts warranted a recovery for the amount of the verdict, $5000. Had either party desired a more specific instruction as to what should be taken into consideration in determining the amount of the verdict, such as we held to be proper in the case of Foster v. West, 184 S. W. 165 (not yet officially reported), the same should have been requested. That case and others there cited are authority for refusing the instruction asked by defendants.

Finding no material error in the trial of this case, the judgment is affirmed.

*Robertson, P. J.,* and *Farrington, J.,* concur.

## ON MOTION FOR REHEARING.

FARRINGTON, J.—Since the filing of a motion for rehearing by the appellants I have become convinced that the judgment in this case should not be affirmed, and that the opinion heretofore rendered is in conflict with decisions of the Supreme Court and the St. Louis and Kansas City Courts of Appeals.

That opinion contains a statement which I do not think the record will bear out, which statement is as follows: "According to plaintiff's evidence, the deceased shortly left this camp, going to the railroad and then south toward the trestle along the east side of

the train while it was standing on the track opposite the camp, *intending to cross over the trestle and visit a friend who lived somewhere beyond.*"

That portion of the above excerpt from the statement of facts which I have italicized is the part that I think is not warranted by the record. The only evidence in the record bearing on the question as to where Starks was going is found in the testimony of James Willis, as follows: "When he left the camp the train was standing on the track and something like 100 feet from where the camp was. When he got to the train he went down the railroad track by the train. He told me that morning that he was going to a neighbor's that lived on the railroad down there, he said he was going to go down there to see them and that he had met them somewhere and he was going back to see them, and I supposed that that was where he was where he was going. When he left us I never noticed him very far down the track, and never paid any attention to his reeling. I saw him going down the ·side of the track, and he walked off twenty or thirty steps down there and I never paid any more attention to him. He was going down by the side of the train. The next time I saw him was on the stretcher at the depot."

The evidence of all the witnesses shows that Starks left the camp where he had assisted his father in unhitching the team and started toward the defendants' railroad track, and that when he reached the track he started down toward the rear of the train and was seen to walk for only a short distance in that direction by any of the witnesses, other cars obstructing the view. We next hear of him through plaintiff's witness who swore that while the caboose of the freight train was standing some 300 feet north and east of the trestle he saw a young man answering the description of Starks sitting on the railroad ties with his arm and head resting on the rail at a point about two rail lengths back of the standing caboose. This witness aroused him, called attention to the danger, and got him off the track and down the railroad embankment and left him. The witness says that the man then started

staggering back up the embankment toward the track. No more is heard of Starks until several hours after this when his dead body is found on the far side of the trestle from where he was last seen, which, under the evidence, was some 600 feet from where he had been found sitting on the ties with his arm and head on the rail.

Under the evidence it is clearly and reasonably inferable that Starks started down the side of defendants' track toward the caboose; that the man sitting or lying on the track about two rail lengths from the standing caboose was Starks; that he was killed by a collision with a railroad train on the trestle; and that it was the freight train along which he had walked, between six and seven o'clock in the evening, that struck and killed him. All the witnesses for plaintiff agree that defendants' train stopped for some little time, switching and backing the cars at this station, and that it had pulled in and stopped for some time before Starks was seen leaving the camp and going toward the train. He was never seen by any witness walking on the railroad track. After he was aroused and gotten off the track by the witness who found him there, he was never seen going toward the trestle by any of the witnesses. He may have walked out on the trestle before the train backed, but there is not a scintilla of evidence in the record that he did so other than that his body was found on the trestle several hours afterward. He may have caught the train as it was backing and attempted to ride and thus reached the point on the trestle where his body was found, but there is no testimony in the record to sustain this conjecture. To make my position clear, it is purely conjectural under this record to say that Starks walked on the trestle to the point where his dead body was found or to say that he rode there.

The whole theory of the plaintiff's case is that there should be a recovery on the humanitarian doctrine. Plaintiff has shown with reasonable certainty that it was the defendants' freight train which was standing at Delta between six and seven o'clock in the evening that struck and killed Starks. This, how-

ever, is an inference to be drawn from the circumstances of the case rather than direct evidence of the fact. Plaintiff, in order to recover under the humanitarian doctrine, must also establish that Starks was on the trestle at or near the place where he was killed for a sufficient length of time that had a proper lookout been stationed on the rear of the train as it backed he would and should have been seen and the train stopped in time to save his life; and it is on this proposition that I think there is an utter dearth of evidence on which to base a finding that could· be said to have any foundation whatever. If Starks did walk on the trestle to the point of the collision, then I agree with the opinion heretofore rendered that he was at all times in peril where it was the duty of the defendants to see and save him; but where I differ with that opinion is that there is no evidence on which it can be legitimately found that Starks was ever at any time walking on this trestle, and this leads me to now dissent from the following sentence in the opinion: "Under the foregoing evidence we think the jury was warranted in finding that the deceased had passed the caboose and gone upon the trestle before the train backed up and that no trainman was then at the rear end of the train who could or did look out for a clear track or take steps to avert danger." To so reason seems to me to base the finding, first, on an inference (and it is wholly inferential) that Starks was killed where he was found by defendants' freight train, and then, having established that fact by an inference, to further infer from that that he was walking on the trestle. This is basing an inference on an inference, which as I construe the decisions in this State is not permissible. The only theory for a recovery advanced here is on a finding that Starks was walking on the trestle. I find no evidence in the record to justify a conclusion that he was walking on the trestle any more than to justify a conclusion that he caught the train as it backed, after he staggered up the embankment toward the track, and rode to the point on the trestle where his dead body was found.

Therefore, the opinion heretofore rendered in my judgment is in conflict with the rule announced in Warner v. Railroad, 178 Mo. 125, 1. c. 134, 77 S. W. 67, and with the principle declared in . Smart v. Kansas City, 91 Mo. App. 586, 1. c. 593, and Smillie v. St. Bernard Dollar Store, 47 Mo. App. 1. c. 406; and that it is also in conflict with Hamilton v. Railway Co., 250 Mo. 714, 157 S. W. 622, and Whitesides v. Railroad, 186 Mo. App. 608, 172 S. W. 467, in that to make the defendants liable, the finding that Starks was walking on the trestle as the freight train was backing is basing an inference on an inference. The failure to make a liability in the cases of Hamilton v. Railway Co. and Whitesides v. Railroad, supra, and in Wilkerson v. Railroad, 140 Mo. App. 306, 124 S. W. 543, was because of the absence of evidence showing when the injured person got into the danger zone; and it seems to me that in our case it is just as important, to sustain a verdict in plaintiff's favor, that the evidence be not speculative or conjectural as to *how* Starks got to the place on the trestle where his dead body was found. The reasoning in the cases last above referred to, on the failure to show *when,* seems to me to be pertinent to the question before us. I am in favor of granting a rehearing, and, if this be denied, ask that the case be certified to the Supreme Court for the reason that I deem the opinion rendered in conflict with the cases herein cited.

PER CURIAM.—An order having this day been entered overruling appellants' motion for a rehearing, pursuant to the request of FARRINGTON, J., in a separate opinion filed, wherein he deems the controlling opinion in conflict with certain enumerated decisions of the Supreme Court and St. Louis and Kansas City Courts of Appeals, this cause is certified to the Supreme Court for final determination under the provisions of section 6 of the Amendment of 1884 to article VI of the Constitution.