LAVINIA BAILEY, By Guardian, Appellant, v. CHI-
    CAGO, BURLINGTON & QUINCY RAILROAD
    COMPANY and BENJAMIN BLACKLEDGE.

Division One, October 11, 1920.

1. NEGLIGENCE: Pedestrian on Railroad Trestle: Demurrer. The
trestle south of a bridge was 272 feet long; it consisted, in part,
of parallel rows of wooden piles, fourteen feet apart, on the tops
of which were timbers thirteen inches square, called "caps;" on
the caps, parallel with the track, were stringers sixteen inches
high, and across them were the ties, and near the end of the ties
guards, six inches high and eight inches wide, were laid, and
between them were the rails; the caps extended two feet, on
each side, beyond the ends of the ties, and the ends of the caps
extended two feet and ten inches beyond the end of the pilot-beam,
which was five feet and one inch above the caps, so that it was
possible to stand on the end of the cap, and by stooping down,
avoid being struck by the pilot-beam. Deceased was walking
south on the trestle, and the engineer of a southbound train,
running at a speed of thirty-five miles an hour, saw him when
he was a quarter of a mile north of him, and immediately sounded
the whistle, two long and two short blasts, and the bell rang
automatically; deceased turned to the right, then to the left,
stepped over the rail, taking four or five steps in all, and then
got down on his knees, when the engineer lost sight of him; the
speed on the train had not been slackened, and when the engineer
lost sight of deceased he was about 200 feet away, and at that
time the fireman shouted to the engineer to stop, and he immediate-
ly shut off steam and applied the air and the emergency brake,
and the train stopped within 350 feet; deceased was facing south,
and the pilot-beam struck him on the hip, and knocked him to
the east side of the trestle and into the water below. After the
whistle sounded, deceased looked back towards the engine, stepped
beyond the end of the ties, and then stooped down as if he were
going to get out on to the cap; and the engineer testified that he
had frequently seen pedestrians on the trestle, and that they
always stepped down onto the ends of the caps, and avoided injury,
and he supposed from deceased's action that he was doing the
same. Held, that deceased had at most only a narrow chance for
his life after his peril was discovered, and the case was one for
the jury, to determine whether the engineer was guilty of negli-

gence in not checking the train after he discovered deceased's peril, notwithstanding his contributory negligence.

2. ———: ———: **Discovery: Presumption of Prudent Action.** The engineer of a rapidly-moving railroad train when he discovers a pedestrian on a trestle in such perilous situation that he cannot extricate himself before the train reaches him, has no right to presume that he will get off the track when he hears the whistle or other warning. When the pedestrian's only chance to save his life, after he sees the approaching train or hears the warning, is to quickly step down from a trestle to a perilous position at the end of a narrow "cap" on top of the wooden piles, the engineer cannot presume that he will safely reach that small place of safety before the rapid train strikes him.

3. ———: ———: ———: ———: **Safe Escape of Other Pedestrians.** The fact that the engineer has frequently observed other pedestrians with sufficient agility of body and presence of mind to save themselves by quickly getting down from the track and standing on the narrow space at the end of the "caps" on top of the parallel rows of piles, will not justify him in assuming that an ordinary man will always do likewise.

4. ———: ———: **Perilous Position.** A high trestle, 272 feet long, with a river in flood rushing under it, is a place of peril to a pedestrian thereon from the time the engineer of a rapidly-moving train sees him, especially where there is no place of safety except upon the perilous ends of the "caps," and is such a position as to produce terror and to temporarily deprive ordinary persons of prudent self-contro; and where the evidence tends to show that even this narrow place of safety on the end of the cap the pedestrian did not have time to reach after the whistle was blown, that the engineer could have stopped the train several times after he saw him on the trestle before striking him, and that no effort was made to stop the fast train until the engine was within 150 to 200 feet from him, the jury has a right to infer negligence on the part of the engineer.

Appeal from Macon Circuit Court.—*Hon. V. L. Drain,* Judge.

REVERSED AND REMANDED.

*A. D. Morris, E. O. Jones* and *Fogle & Fogle* for appellant.

(1) The plaintiff proceeded properly and had a good cause of action under the humanitarian doctrine.

Starks v. Lusk, 194 Mo. App. 250; Adams v. Railroad, 74 Mo. 553; Morgan v. Railroad, 159 Mo. 275; Reyborn v. Railroad, 187 Mo. 574; Murphy v. Railroad, 228 Mo. 79; Dutcher v. Railroad, 241 Mo. 137; Foster v. West, 194 Mo. App. 94; Pope v. Railroad, 242 Mo. 240; Palmer v. Railroad, 142 Mo. App. 458. (2) That the deceased may have seen the train coming toward him will not defeat the plaintiff, because deceased could not have moved to a place of safety. Palmer v. Railroad, 142 Mo. App. 458; Pope v. Railroad, 242 Mo. 240; Adams v. Railroad, 74 Mo. 553; Reardon v. Railroad, 114 Mo. 405; Woodis v. U. R. Co., 203 S. W. 489; Armstrong v. Railroad, 195 Mo. App. 83. (3) Deceased was in peril necessarily, while on the trestle, wherever he was and whatever he was doing. Starks v. Lusk, 194 Mo. App. 250. (4) The engineer owes the duty, not only of using the utmost care after he knows injury is imminent, but must use ordinary care to anticipate injury before it becomes imminent. Foster v. West, 194 Mo. App. 101. (5) It was not necessary that the defendant should actually know of the danger to which the deceased was exposed. It is enough, if having sufficient notice to put a prudent man on the alert, he does not take such precaution as a prudent man would take under similar notice. Klockenbrink v. Railroad, 172 Mo. 687, 81 Mo. App. 351. (6) If defendant, after discovering the peril of deceased, could not have stopped the train, but could have saved deceased by slowing down, and failed to do so, then defendant is liable. Maginnis v. Railroad, 182 Mo. App. 694. (7) In determining whether the cause should have been submitted to the jury, all evidence and inferences unfavorable to appellant must be disregarded, and all evidence and all reasonable inferences favorable to him must be taken into consideration. This rule is not affected by the fact that the witnesses were all called by appellant. While he could not impeach one of his own witnesses, he was at liberty to prove the facts to be otherwise than as such witness testified. Frankel v. Hudson, 271 Mo. 503; Schumacher

v. Breweries Co., 247 Mo. 154, 155. (8) Where the evidence is conflicting, the issues must be submitted to the jury. Sinamon v. Moore, 161 Mo. App. 168; Bothe v. Railroad, 181 Mo. App. 720.

H. J. Nelson, Ben Franklin, Campbell & Ellison and J. G. Trimble for respondents.

(1) While appellant has cited a great many cases, there is none that is in point in this case. They are all cases where the deceased, or the party injured, was in plain view of the engineer (or would have been had the engineer been watching), who could see they were unconscious of the approach of the train or unable to get out of its way. (2) The only question presented by the appellant is: Was the engineer justified in believing the deceased intended to get down to the cap? (3) Under the circumstances, the engineer was under no obligation to make any effort to stop his train until he saw the deceased had changed his mind and instead of getting down to the cap, intended to squat or kneel on the ties. Veatch v. Railroad, 145 Mo. App. 232; Gumm v. Railroad, 141 Mo. App. 306; Schupp v. Railroad, 166 Mo. App. 597; Pope v. Railroad, 242 Mo. 232. (4) Appellant's two trestle cases, Starks v. Lusk and Adams v. Railroad, are not similar to the case at bar. The cases of Veatch v. Railroad, and Pope v. Railroad, announce the doctrine applicable to this case. (5) In the present case there was an "Isle of Safety" known to the engineer and known to the deceased. Unlike the deceased in the Pope case, he deceased in this case started to the "Isle of Safety," but changed his mind too late for the engineer to stop the train and avoid striking him.

SMALL, C.—Plaintiff's husband on May 6, 1917, was killed or drowned by, being knocked off of a trestle connected with defendant's bridge over the Chariton River in Schuyler County. Defendant Benjamin Blackledge was the engineer in charge of the train. The

track (for some distance), bridge and trestle ran north
and south.  The bridge proper is 139 feet and 6 inches
long.  The trestle on the north side of the bridge is 41
feet and 6 inches long, and on the south side 272 feet
and 10 inches long.  So that the bridge and trestle-work
altogether measured 453 feet and 10 inches.  The rail-
road track extends straight north from the trestle about
1071 feet.  North of that the track curves, but a man
on the bridge could be seen by one standing on the track
on the curve 1662 feet away.  The trestle-work was
built on wooden piles driven into the ground.  On these
piles, which were in parallel rows about 14 feet apart,
there was a heavy piece of timber 13 by 13 inches square,
called the "cap."  Stringers were laid parallel with the
track on top of these caps.  These stringers were 8
inches wide by 16 inches high.  On top of and across
the stringers, the ties, which were 8 by 8 inches square,
were laid.  Near the end of the ties was a wooden guard-
rail 6 inches high and 8 inches wide.  The track was laid
between these guardrails.  The caps on the piles extended
about 2 feet beyond the ends of the ties, and the ties
about 10 inches beyond the pilot-beam of an engine.
The end of the caps was about 2 feet and 10 inches
beyond the end of the pilot-beam, which was 5 feet and
1 inch above the top of the caps.  So that it was *possible*
to stand on this cap, by stooping down, and avoid being
struck by the passing engine.  At the time in question,
the river was out of its banks and flowing under the
trestle-work.  It was broad daylight.  The train was
going south; so was Bailey, the deceased.

The engineer testified that the train was running 35
miles an hour, possibly a little faster, as they were late,
and he was trying to make up time.  That he was about
a quarter of a mile north of the bridge when he dis-
covered Bailey on the trestle-work south of the bridge.
He then gave the regulation crossing whistle, 2 long and
2 short blasts; the bell was ringing automatically.  He
did not sound the whistle any more, but continued down

284 Mo.—31

the track at the same rate of speed. After the whistle was sounded, Bailey turned to the right, then went a few steps further, and then turned to the left, and stepped over the rails on the ends of the ties on the left hand side of the track, and turned again and looked. He then got down as far as his knees, when the engineer lost sight of him. As the engineer lost sight of him, he was 200 feet away and between 100 and 150 feet south of the bridge proper on the trestle. At the same time, the fireman "hallooed" to the engineer to stop. The engineer immediately shut off the steam and applied the air and the emergency brake. The train then stopped, so that the rear end of it, when it stopped, was at the point where Bailey was knocked off of the trestle into the water. The train, including the engine, was about 180 or 200 feet long.

The engineer testified that the train could have been stopped, at the rate of speed he was going, within 350 feet. He further said, that he was watching the man all the time except possibly when his attention had to be given to something else, but his attention was not taken away from the man any length of time. That he crossed the river with trains 32 times every day. That it was a frequent occurrence for men to use the bridge to cross that river. That on numerous occasions, when he had seen men walking on the bridge, as he approached, they simply went over to the end of the ties, and stepped on the caps, if they were on the trestle, and he passed them in perfect safety. That he had done that all of the 15 years he had been running there. It was a very common occurrence. On this occasion, deceased stepped on the end of the ties and got down on his knees, the same as others had done, to step down on the cap to let him go by. There was no difference in this man's movements and actions from that of other people who had got down on the caps, as he thought deceased was going to do. The next day, at the same place, there

were a number of people gathered and some of them stepped down on the caps of the trestle to let him go by. When he first saw deceased, the latter was walking on the track; he could not tell whether he was an old man or a young man. He was walking in just the ordinary way, when he first saw him, and during all of the time he did see him. After he discovered, or was informed, that Bailey was in peril, or was not getting down on the cap, as he believed he was in the act of doing, there was nothing that could have been done, that he did not do, in order to avoid striking him.

The fireman also testified that he saw Bailey, when they were about a quarter of a mile away north of the bridge. That he watched him practically all of the time. That the engineer first commenced to diminish his speed within 150 or 200 feet of Bailey. The pilot-beam struck him on the hip. He was facing south, and it knocked him to the east side of the trestle and into the water. When the train stopped, the fireman went back, crawled part of the way on the guard-rail, and he saw Bailey float through under the trestle and sink out of sight in the water. He also testified that after the whistle sounded, Bailey turned around and looked back toward the engine, and stepped out from the middle of the track on the trestle, onto the ties outside of the rails, and then looked back again. Bailey got down, stepped or squatted down, as if were going to get out onto the cap. When within 150 feet of him, he saw that Bailey was not making the effort he should, and he "hallooed" at the engineer to stop, that he was going to strike somebody. Whereupon, the engineer immediately shut off the steam, and applied the emergency, and made, what he considered, a good stop. Deceased took four or five steps, not to exceed five, after the whistle was sounded, until the fireman saw him trying to get down on his knees. When the engine struck him, he was down on his knees, and had both hands on the guardrail. He was just over a cap as near as he could get.

Other witnesses for plaintiff testified: That Bailey was about sixty-five years of age, and hard of hearing. He lived about a mile south and a little east of the bridge. One witness said Bailey could scarcely hear anything.

There was also evidence that a man on the track, north of the bridge, where the curve commences about 1000 feet away, could not tell whether men standing on the south end of the bridge, turned and looked around or not.

The defendants introduced no testimony, except that of one witness, who testified that he stepped down on the cap to let the train pass, on the day following the accident.

At the close of all the testimony the court sustained a demurrer to the evidence, asked by the defendants. New trial being refused, plaintiff appealed.

I. We think there was a case for the jury. It is strenuously argued, however, on behalf of defendants, that the engineer had a right to suppose that the deceased would leave the track and get into a place of safety, because, after the whistle sounded a quarter of a mile away, the deceased apparently looked back towards the engine, left the center of the track on the trestle, where he had been walking, and got over on the ends of the ties. But it appears that the train was behind time and going 35 miles or more an hour, and never slackened its speed until within about 150 or 200 feet of the deceased, when the fireman told the engineer to stop, that he was going to run over somebody. It is true, the engineer testified that he had frequently seen men on this bridge ahead of him, and that they always, theretofore, had stepped down onto the end of the caps, and he had passed them in safety and that from deceased's actions, he was apparently doing, or was going to do, the same thing. But when he observed him so doing, actually kneeling down, as the engineer supposed, for the purpose of getting on the cap, it was too late to stop the train to save him. It

was broad daylight, and both the engineer and the fireman testify, that they were watching the deceased from the time they first saw him a quarter of a mile away, until he was killed.

We hold that the deceased was in peril at the time the engineer first saw him on the trestle, just across the bridge. His margin of safety was very slight indeed. The engineer should have had his train under control from the time he first saw the deceased on this trestle. The engineer knew he had no time to get off of the trestle and that the only chance he had for his life was to get down and stand upon this narrow and perilous place on the end of one of the caps. The fireman testified that the deceased only took three, four or five steps, not to exceed five, after the whistle sounded, and the whistle was sounded when they first saw him. The engineer says that the deceased seemed to walk in the ordinary way, when he took these steps. Going at the rate of speed this train was, unless its speed was checked, after the engineer sounded the whistle, the deceased would be overtaken by the train before he had time to find and step down to the perilous position on the cap. There was, at least, evidence upon which the jury could so find.

There is a wide difference between this case and the usual case, where the engineer sees a man some distance ahead of him on the track, on the ordinary right of way of the railroad company. In such cases, the engineer has a right to presume the man will get off of the track safely, when he hears the whistle, because he has time and opportunity to do so, which did not exist in the instant case, where the deceased was on this dangerous trestle with no place of safety which he could reach in time to save his life.

In Pope v. Railroad, 242 Mo. l. c. 239, we said:

"In the case of Kinlen v. Railroad, 216 Mo. l. c. 164, this court said: 'The humanitarian doctrine only applies and authorizes a recovery where the injured party is ignorant or oblivious to the impending danger; but if

he knew of the approaching danger, then clearly he would be guilty of such contributory negligence as would prevent a recovery, whatever the conduct of the agents in charge of the train might be.' The foregoing language must be understood as applying to a case in which a person is upon the track at a place where he could safely have gotten off and out of danger when conscious of the train's approach.''

The mere fact that the engineer, theretofore, had encountered persons on this or other trestles with agility and presence of mind enough to save themselves by getting down and standing in this narrow space upon the end of the caps, did not justify the engineer in believing that an ordinary man would or could always do this. It seems to us, that but very few ordinary men would have much chance of escape under such circumstances as surrounded the deceased in this case, unless the train slowed down or indeed was stopped entirely. This was, at least, for the jury to pass upon.

In Adams v. Railroad, 74 Mo. 553, the deceased, a man fifty or sixty years of age, in company with his three sons, was walking on the railroad track. He saw the train coming a half mile away before he went upon a long trestle west of Chillicothe. After getting on the trestle, the oldest son, who was fourteen years old, told him he had better come back, but the deceased said he thought he could cross the trestle and get away. They had proceeded about one-third of the way across the trestle, when the oldest boy turned back and got off. The father and the younger sons went forward, and when about half way over the trestle, they sat down on the ends of the ties, when the father raised up, after the engine and three or four cars passed without injuring them. In raising up the father was struck, knocked off and received injuries which caused his death. This court, Judge HENRY delivering the opinion, says, at page 555: ''The negligence of the deceased was such as to preclude a recovery unless the servants of the defendant

running the train saw the danger to which he had ex-. posed himself in time to have stopped the train and avert the calamity. It is no defense to the action that he was guilty of negligence in going on the trestle, no matter how gross, if the servants of the company saw him on the trestle, and after discovering him there, could have stopped the train and thus have avoided injuring him. His negligence then ceases to be a matter for considera-tion." On page 560, Judge HENRY continued: "The position of appellant's counsel, that the carelessness of the deceased, in rising up, after four or five cars, but before the entire train had passed, precludes a recovery, even conceding that, but for such carelessness, defendant would be liable, if they saw him on the trestle, and by proper care could have stopped the train, and thus avoided injuring him, is untenable. One in so perilous a position is not to be held to the exercise of the same care and prudence as if he were in a place of security. The terror, temporarily depriving the deceased of the proper use of his faculties, was produced by the recklessness of defendant's servants, managing the train, if they saw him and could have stopped the train, after they dis-covered him on the trestle, before it reached him."

Thus, this court has decided that a trestle, although it is possible to sit down on the end of the ties, which, in this case was not possible, and avoid being struck by an onrushing train, is not a "place of security," but a "perilous position," which may even produce such ter-ror as to temporarily deprive persons of the proper use of their faculties. To this we agree.

So, recently we have had occasion to consider this same subject. In Starks v. Lusk, 194 Mo. App. 250, the plaintiff's husband was killed by reason of a freight train running over him, while backing over a trestle. As to every place being a place of peril on a trestle, the opinion of the majority of the appellate court, at page 258, used this language: "This was an open trestle with nothing whatever to prevent the seeing of a man,

or any object, at a considerable distance whether he be walking, standing, sitting or lying down. What is more important here is that deceased was necessarily in peril from the time the train entered on the trestle until it struck him, whether he was walking standing, sitting or lying down and regardless of what part of the trestle he was on. He could have come onto the trestle nowhere but at the north end and, wherever he was between those points, and whatever doing, he was in peril. He was killed about 280 feet from where he entered into the place of peril and while the train was going that distance, at least, the deceased was seeable and was in a position of danger whatever he was doing or wherever he was. The train could have been stopped in much less distance. The place where this deceased was killed was not like the open road bed in the Hamilton and Whitesides cases, where only a step or two in space and a moment of time separated the place of safety from the place of danger." The case being certified to this court by the dissenting judge, the opinion of the majority was adopted by this court (216 S. W. 1119.). But even the dissenting judge designated every part of a trestle as a place of peril, saying (194 Mo. App. l. c. 263): "If Starks did walk on the trestle to the point of collision, then I agree with the opinion heretofore rendered, that he was at all times in peril where it was the duty of the defendant to see and save him."

We hold, that in the case before us, the deceased was in imminent danger at all times, while on the trestle after the engineer first saw him, with no place of refuge, except this perilous position on the end of a cap. And even this perilous position, the evidence tends strongly to show, he had not time to reach, after the whistle was blown. But the engineer could have stopped the train several times, according to his own evidence, after he saw the deceased on the trestle before he struck him. The jury had a right, therefore, to infer from the evidence that the engineer was guilty of negligence in speed-

ing the belated train with unabated velocity, so that it overtook' deceased before he could take more than four or five steps towards the perilous place on the end of the cap. There was ample evidence from which the jury might infer negligence, on the part of the engineer, in making no effort to stop or decrease the speed of the train, until within 150 or 200 feet of the deceased, when it was too late.

There was a case for the jury under the humanitarian doctrine. The judgment of the lower court should be reversed, and the cause remanded to be proceeded with in accordance with the views herein expressed.

It is so ordered.

*Brown* and *Ragland, CC.,.* concur.

PER CURIAM:—The foregoing opinion of SMALL, C., is adopted as the opinion of the court. All of the judges concur except *Woodson J.,* absent.