BEULAH BENSON v. MISSOURI PACIFIC RAILROAD COMPANY, Appellant.
—69 S. W. (2d) 656.

Division Two, February 23, 1934.

*Edward J. White, Thomas Hackney, Leslie A. Welch* and *Richard H. Beeson* for appellant.

*James P. Aylward* and *A. A. Ridge* for respondent.

FITZSIMMONS, C.—Defendant railroad company appeals from a judgment of the Circuit Court of Jackson County at Kansas City, reversing an award of no compensation made by the Missouri Workmen's Compensation Commission and remanding the cause to the commission for further proceedings.

Plaintiff's claim was for compensation for the death of her husband, caused by accidental injuries suffered in the course of and arising out of his employment by the defendant. The commission

based its award of no compensation upon the ground that, at the time of the injury, the employee, Oliver T. Benson, was engaged in interstate commerce, and therefore that the cause was exclusively covered by Federal law, to which by Section 3310a, Revised Statutes 1929, the Missouri Compensation Act does not apply. The Supreme Court of the United States has ruled often that, in the case of an employee who is injured or killed while he is engaged in interstate commerce, the rights and liabilities of the employer and employee are inclusively and exclusively regulated by the Federal Liability Act. [Sec. 51, Chap. 2, Title 45, Railroads, U. S. Code Annotated.] The Federal decisions hold that in the case of accidents so occurring no room exists for the operation of State Compensation Acts even in respect of injuries caused without fault of the employer, as to which the Federal Act provides no remedy. [New York Central Railroad Co. v. Winfield, 37 Sup. Ct. 546, 244 U. S. 147, 61 L. Ed. 1045, reversing 110 N. E. 614, 216 N. Y. 284, Ann. Cas. 1916A, 817.] The circuit court, by its judgment reversing the award of no compensation found that the employee, at the time of his injury, and death, "was not engaged in interstate transportation of commerce so as to bring his injury and death within the purview of the Federal Employers' Liability Act," and that the Missouri Workmen's Compensation Commission had jurisdiction to award compensation to the dependents of the deceased. The facts were not disputed at the hearing before the commission. It is for us to determine whether the Missouri Workmen's Compensation Act or the Federal Liability Act governs.

The deceased, Oliver T. Benson, was employed by defendant railroad company as assistant general yardmaster in zone 2, embracing what is known as the East Bottom railroad yards at Kansas City, Missouri. His hours of duty were from 6 p. m., to 6 a. m. At or about 10:30 p. m., May 10, 1932, Benson entered his office in the yards, and the night being chilly and damp, he set about to build a fire in a heating stove. He poured some kerosene upon the fuel in the stove. There was an instant explosion. Benson's clothes took fire and he received bodily burns from which he died two days later.

Benson, during his tour of duty, directed the make-up of outbound and break-up of inbound freight trains. His immediate superior was Earl H. Campbell, general yardmaster of the defendant railroad company. Both men went on duty at 6 p. m., May 10, 1932, and almost immediately they had a conference in Mr. Campbell's office at which they laid out the night's work in zone 2. They did this by means of reports before them. These reports were made up by yard clerks and consisted of the "turn-over" (cars then in the zone), and the "line up" of inbound trains (of which they had advance telegraphic information, giving the numbers, contents and destination of the constituent cars). They also checked special orders. The conference being ended, Benson went to his office and entered upon

the discharge of his night's duties. Campbell dealt alone with his assistant general yardmasters, of whom there were two, one in charge of each of two zones. But Benson and the other assistant general yardmaster had assistant yardmasters under them. Benson was of the highest rank of servants of defendant to give orders to switching crews and assistant yardmasters touching the make-up, break-up and other disposition of freight trains.

The "turn over," that is, the freight cars in the zone when Benson took charge that night, consisted of 972 cars. Of these seven went out in trains that night to Wagner, Oklahoma, fifteen to Wichita, Kansas, and forty-six to East line connections at St. Louis, Missouri. While Benson was on duty, from 6 P. M., to the time of his injury at 10:30 P. M., there came into the zone three freight trains and there departed seven. The times of arrival of the inbound trains and the places whence they came were as follows: 6:30 P. M., from Jefferson City, Missouri; 6:55 P. M., from Omaha, Nebraska, and Atchison, Kansas; 7 P. M., from Osawatomie, Kansas. The time of departure from zone 2 of the seven outbound trains was as follows: 7:25 P. M., for St. Louis, Missouri; 7:40 P. M., for Osawatomie, Kansas; 7:50 P. M., for Osawatomie, Kansas; 8:45 P. M., for Nevada, Missouri; 8:50 P. M., for St. Louis, Missouri; 10:15 P. M., for Osawatomie, Kansas; 10:30 P. M., for Myrick, Missouri. The trains departing at 10:15 and 10:30 P. M., were completed at 9:15 P. M., and 10 P. M., respectively. The train which departed for Myrick, Missouri, at 10:30 P. M., contained cars loaded with freight from Conroe, Texas; Eldorado, Kansas; Deweese, Mississippi. After Benson had been injured and had been removed from the yards and his work had been taken over by Mr. Campbell for the remainder of the night of May 10-11, 1932, there came into zone 2 five freight trains and there departed three. The times of arrival of the inbound trains and their points of origin were: 11:25 P. M., Osawatomie, Kansas; 11:50 P. M., Omaha, Nebraska; 1:40 A. M., Nevada, Missouri; 1:50 A. M., St. Louis, Missouri; 4:30 A. M., Myrick, Missouri. The times of departure of the outbound trains and their destinations were: 12:01 A. M., Nevada, Missouri, 12:55 A. M., St Louis, Missouri; 4:20 A. M., Pueblo, Colorado.

The inbound freight trains, upon arrival in the zone, were broken up by the switching crews, and, by them, the constituent cars were placed in outbound trains or were transferred to connecting carriers or were set aside for delivery the next day upon Kansas City industrial tracks. The switching crews also made up the outbound trains, and they did all their work with inbound and outbound trains and their constituent cars according to orders which Benson gave them in advance, and which he based on the data which he and General Yardmaster Campbell had before them at their conference. Benson had in his office two telephones: One of these was for communication,

by means of loud speakers, with switching crews and assistant yard-masters working in the zone. Some of the cars in all trains which passed into or out of the zone that night were moving in interstate commerce, others in intrastate commerce. Some of the cars were loaded, others were empty.

General Yardmaster Campbell, who took up Benson's work after the accident, testified that, about fifteen minutes before the fire Benson ordered train No. 263, Joplin Division, to pull through the train yard into Junction 18. This train consisted of loaded cars from Minneapolis, Minnesota, to Colony, Kansas. It left the zone at 12:01 A. M., May 11, about an hour and a half after the accident. As far as Mr. Campbell knew, this was the last order that Benson gave. But Percy C. Parks a switchman whose crew stopped near Benson's office about 10:30 P. M., their quitting time, testified that Benson gave them as a last order, a direction to move a car, destined for St. Louis, Missouri, from track 14 to the train yard. The record does not show whence this car had come nor when nor what was its ultimate destination. Prior to receiving this order, in Benson's office, Parks had aided Benson in gathering kindling for the fire which Benson was about to build in the stove. Parks had moved 150 feet from Benson's office when he heard the explosion and saw Benson aflame. The building of the fire by Benson in the office stove did not have anything to do with the movement of cars and the movement of trains in the yard over which Benson had supervision could have been accomplished without the building of any fire by him, according to the testimony of Mr. Mahoney, superintendent of defendant's terminals.

■ I. The United States Supreme Court, in New York Central and Hudson River Railroad Co. v. Carr (1915), 238 U. S. 260, 35 Sup. Ct. 780, observed that, under the Federal Employers' Liability Act there arise cases in which "it is difficult to define the line which divides the State from interstate business,"—in other words, to say whether State or Federal law governs. And because the first Federal Employers' Liability Act, approved June 11, 1906, did not draw the line mentioned, that act was held unconstitutional. [The Employers' Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297.] The United States Supreme Court, in its opinion said (207 U. S. 1. c. 498) : "The act then being addressed to all common carriers engaged in interstate commerce, and imposing a liability upon them in favor of any of their employees, without qualification or restriction as to the business in which the carriers or their employees may be engaged at the time of the injury, of necessity includes subjects wholly outside of the power of Congress to regulate commerce." But the second Federal Employers' Liability Act, approved April 22, 1908 (being the act here in question, Sec. 51, Chap. 2, Title 45, U. S. Annotated

Code), did draw a proper constitutional line in the opinion of the United States Supreme Court, and therefore that act was held to be valid. [Second Employers' Liability Cases (1912), 223 U. S. 1, 32. Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44.] In practice however, it appears that in many decisions by Federal and State courts, before and after the Carr case, supra, the line of distinction between the two jurisdictions, if it be regarded as a continuous line in cases involving similar facts, is at least irregular in its course, poorly defined, and at times productive of some confusion of mind and uncertainty of judgment. For confirmation of this statement, the student is referred to 279 pages of annotations of the Liability Act. [Sec. 51, Chap. 2, Title 45, U. S. Code Annotated.] But in our opinion, the United States Supreme Court, by its later decisions, which should control, has done much to make more definite and certain the rules and tests which govern the applicability of the Federal Act.

In the case of Pedersen v. Delaware, Lackawanna & Western Railroad Company (1913), 229 U. S. 146, plaintiff Pedersen was employed by defendant railroad as an iron worker in the alteration and repair of some bridges which defendant was regularly using in interstate and intrastate commerce. While the plaintiff was crossing one of these bridges carrying a sack of bolts to be used in the repair of another bridge, he was run down and injured by an intrastate passenger train. The United States Supreme Court, in the majority opinion, holding that the Federal Employers' Liability Act applied, ruled (229 U. S. 1. c. 152): "The true test always is: Is the work in question a part of interstate commerce in which the carrier is engaged?" Mr. Justice LAMAR, in a dissenting opinion, gave expression to views which in a later case to be mentioned, received, as we believe, the force of law. These dissenting views in part were (229 U. S. 1. c. 153):

"I am unable to assent to the proposition that a man carrying bolts to be used by him in repairing a railroad bridge was employed in interstate commerce. Transportation has been defined as commerce, and those engaged in transportation are employed in commerce. But in building the bridge originally the carrier was not 'engaging in commerce between the States,' and the plaintiff, in subsequently repairing it, was not employed in such commerce. Such work was not a part of commerce, but an incident which preceded it. The act provides that 'every common carrier by railroad, while engaging in commerce between any of the States or Territories  .   .   . shall be liable in damages to any person suffering injury while employed by such carrier in such commerce.' "

In the case of Shanks v. Delaware, Lackawanna & Western Railroad Co. (1916), 239 U. S. 556, plaintiff sued under the Federal Employers' Liability Act for injuries received while he was taking

down and putting up fixtures in a machine shop which defendant used for repairing locomotives operating in interstate and intrastate commerce. The United States Supreme Court held that the plaintiff could not maintain his action. The opinion in the Shanks case was written by the same justice who wrote the majority opinion in the Pedersen case. But the views which he expressed in the Shanks case, appear to us to be in accord with the minority opinion in the Pedersen case and to be a modification of the test stated in the Pedersen case. In the Shanks case, the United States Supreme Court said (239 U. S. 1. c. 558):

"The question for decision is, was Shanks at the time of the injury employed in interstate commerce within the meaning of the Employers' Liability Act? What his employment was on other occasions is immaterial, for, as before indicated, the act refers to the service being rendered when the injury was suffered. Having in mind the nature and usual course of the business to which the act relates and the evident purpose of Congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion (see Swift & Co. v. United States, 196 U. S. 375, 398), and that the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it." The test of the Shanks case was followed by the United States Supreme Court in Industrial Accident Commission of California v. Davis (1922), 259 U. S. 182, 42 Sup. Ct. 489, 66 L. Ed. 888; Chicago & Northwestern Ry. Co. v. Bolle (1931), 284 U. S. 74, 52 Sup. Ct. 59, 76 L. Ed. 173; Chicago & Eastern Illinois Railroad Co. v. Industrial Commission of Illinois (1932), 284 U. S. 296, 52 Sup. Ct. 151, 76 L. Ed. 304; New York, New Haven & Hartford Railroad Co. v. Bezue, 284 U. S. 415, 52 Sup. Ct. 205, 76 L. Ed. 370.

In the case of Industrial Accident Commission of California v. Davis, supra, the Supreme Court reviewed a decision of the District Court of Appeals which reversed an award of compensation that the Industrial Commission had made to an injured railroad employee. The California District Court of Appeals, in reaching its decision, "concluded, after a review of cases, that Burton's work was 'so intimately connected with interstate commerce as practically to be a part of it, and therefore,' the Commission 'had no jurisdiction.'" [259 U. S. 1. c. 184.] The cases, which the California Court reviewed, cited in the margin of 259 U. S. 1. c. 184, include Pedersen v. Railroad Co., supra. The United States Supreme Court, in reversing and remanding the judgment of the California District Court of Appeals, used the test of the Shanks case in determining the question of application of the Federal Employers' Liability Act or of the California Workmen's Compensation Act. This test as we

have seen is: "Was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it?" In the California case the employee Burton received injuries while working in the general repair shops of a railway company upon an engine that had been employed in interstate commerce and which was destined to be so employed again. The Supreme Court, in the California case, declined "to declare a standard invariable by circumstances or free from confusion by them in application," even, as the court said, if that were ever possible. But the Supreme Court, in that case, made some observations concerning the circumstances of application of the Federal Employers' Liability Act which appear to be in point here. The court said (259 U. S. 1. c. 187):

"The federal act gives redress only for injuries received in interstate commerce. But how determine the commerce? Commerce is movement, and the work and general repair shops of a railroad, and those employed in them, are accessories to that movement, indeed, are necessary to it, but so are all attached to the railroad company, official, clerical or mechanical. Against such a broad generalization of relation we, however, may instantly pronounce, and successively against lesser ones, until we come to the relation of the employment to the actual operation of the instrumentalities for a distinction between commerce and no commerce. In other words, we are brought to a consideration of degrees, and the test declared that the employee at the time of the injury must be engaged in interstate transportation or in work so closely related to it as to be practically a part of it, in order to displace state jurisdiction and make applicable the federal act."

The United States Supreme Court confirmed the test of the Shanks case and repudiated the rule of the Pedersen case in Chicago and Northwestern Ry. Co. v. Bolle (1931), 284 U. S. 74. In that case the court upon the authority of the Shanks case, reversed the judgment of the court below for lack of necessary relationship to interstate transportation. Of the opinion in the Shanks case and of the rule there laid down, the Supreme Court said in the Bolle case (284 U. S. 1. c. 78):

"It will be observed that the word used in defining the test is 'transportation,' not the word 'commerce.' The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. . . .

"Since the decision in the Shanks case, the test there laid down has been steadily adhered to, and never intentionally departed from or otherwise stated. It is necessary to refer to only a few of the

decisions. In Chicago, B. & Q. Railroad Co. v. Harrington, supra, an employee engaged in placing coal in coal chutes, thence to be supplied to locomotives engaged in interstate traffic, was held not to have met the test. In Illinois Central Railroad Co. v. Cousins, 241 U. S. 641, as appears from the decision of the state court (126 Minn. 172, 148 N. W. 58), an employee was engaged in wheeling a barrow of coal to heat the shop in which other employees were at work repairing cars that had been, and were to be, used in interstate traffic. The state court held that the employee came within the act, on the ground that the work which he was during was a part of the interstate commerce in which the carrier was engaged, and cited Pedersen v. Delaware, L. & W. Railroad Co., 229 U. S. 146. This court, however, repudiated that view, and reversed in an opinion *per curiam* on the authority of the Shanks case. . . .

"The rule announced by the Shanks case has been categorically restated and applied also in the following cases among others (citing cases which we have cited heretofore). The applicable test thus firmly established is not to be shaken by the one or two decisions of this court where, inadvertently, the word 'commerce' has been employed instead of the word 'transportation.'"

The divergence between the award of the commission and the judgment of the circuit court in the instant case is identical with the difference between the tests prescribed respectively by the Pedersen case and the Shanks case. The commission based its award of no compensation for want of jurisdiction upon the ground that the deceased, at the time of his injury, was engaged in interstate commerce, which is the test of the Pedersen case. The circuit court by its judgment reversing the award, found that the deceased, at the time of his injury "was not engaged in interstate transportation of commerce," which is the test of the Shanks case. We are of opinion that the judgment of the circuit court in the instant case should be affirmed under the rule laid down in the Shanks case. At the time of his injury Benson was not engaged in interstate transportation of commerce. He was not giving any orders. For the time being, at least, his work of giving orders to make-up and break-up trains, was done. It so appears from the records which defendant offered in evidence. By these records the latest inbound train to arrive in the zone, before Mr. Benson was injured, came in at 6:55 P. M., which was three hours and thirty-five minutes before the accident. And the first inbound train after the accident, arrived at 11:25, P. M., which was fifty-five minutes after the accident. By the same exhibits, it appears that an outbound train departed at 10:30 P. M., which approximately was the time of the accident, but which was also a time at which the make-up work of the switching crews was done. For the record shows as to this train: "started 9 P. M., completed

10 P. M., departed 10:30 P. M.'' Defendants' record of the first outbound train to depart after Benson was injured is: ''started 11 P. M., completed 12:30 A. M., departed 12:55 A. M.'' The testimony of the defendant's general superintendent of terminals that Mr. Benson had a hand in the make-up of the trains which departed after his injury is contradicted by the records which that witness produced. The train which departed at 12:55 A. M., was the first of those. The formation of this train began at 11 P. M., and ended at 12:30 A. M. As was said in the Shanks case, what his employment was on other occasions is immaterial for the act refers to the service being rendered when the injury was suffered.

We cite one more decision of the United States Supreme Court, which bears upon Benson's official inactivities at the time that he was burned. In Erie Railroad Co. v. Welsh (1916), 242 U. S. 303, plaintiff Welsh sued for damages for injuries under the laws of Ohio. The railroad company set up by way of defense that plaintiff Welsh, at the time of his injury, was engaged in interstate commerce and subject to the Federal Employers' Liability Act. The Ohio courts ruled this defense against the defendant and the United States Supreme Court sustained these rulings. Plaintiff Welsh was a yard conductor, engaged in making up and breaking up trains under orders of the yardmaster to whom he reported frequently for orders. The court in its opinion said (242 U. S. 1. c. 305): ''That on this return journey the engine was slowed down near the yardmaster's office, which is at the easterly end of that yard. so as to enable Welsh to report for further orders, all previous orders having been executed; and that the injury was received while he was attempting to alight for the purpose. It was in evidence, also, that the orders plaintiff would have received, had he not been injured on his way to the yardmaster's office, would have required him immediately to make up an interstate train. Upon the strength of this it is argued that his act at the moment of his injury partook of the nature of the work that, but for the accidental interruption, he would have been called upon to perform. In our opinion, this view is untenable.''

It would seem that the view thus taken of the case of yard conductor Welsh even more clearly applies here to the case of assistant general yardmaster Benson, a servant of the railroad company whose work was more remote from the actual movement of interstate trains than were the duties of a yard conductor.

For further authorities which may be in point here, reference is made to our opinion, given at this delivery, in the case of Aldridge v. Wabash Railway Co., 73 S. W. (2d) 401. There the plaintiff invoked the Federal Employers' Liability Act, and the defendant denied its applicability.

862

No error appearing the judgment is affirmed and the cause is remanded for further proceedings in accordance with the judgment of the circuit court. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.