STATE OF MISSOURI at the relation of BRIDGET MULCAHY, Dependent of ROBERT MULCAHY, Relator, v. JEFFERSON D. HOSTETTER, WILLIAM DEE BECKER and EDWARD J. McCULLEN, Judges of the St. Louis Court of Appeals.—139 S. W. (2d) 939.

Division One, May 7, 1940.*

*NOTE: Opinion filed at September Term, 1939, March 6, 1940; motion for rehearing filed; motion overruled at May Term, 1940, May 7, 1940.

66

*Maurice Schechter, H. G. Whelan* and *J. W. Stipelman* for relator.

*Carleton S. Hadley, Arnot L. Sheppard, William A. Thie* and *Walter N. Davis* for respondents.

68

DOUGLAS, J.—This is certiorari to review for conflict with our decisions the opinion of respondents in Mulcahy v. Terminal Railroad Assn. of St. Louis (Mo. App.), 123 S. W. (2d) 235. The issue was whether the plaintiff's claim was under the Missouri Workmen's Compensation Law (Secs. 3299-3376, R. S. 1929, Ann. Stat., pp. 8229-8294) or the Federal Employers' Liability Act, 45 U. S. C. A., sections 51-59.

These facts are found in the opinion. The plaintiff, relator here, is the widow of Robert Mulcahy, deceased, who was in the employ of the railroad as a watchman. In addition to the usual duties of a watchman he also had the particular duty to walk the track searching for broken rails, defective switches and the like. All the tracks, whether main line, switch or yard tracks were shown to be in continuous and indiscriminate use in both interstate and intrastate commerce, but with interstate commerce comprising eighty per cent of the business handled by the railroad. Mulcahy was specially assigned to the Atlantic yards, working from 6 P. M. to 6 A. M. in the territory ten blocks in length between 21st Street on the east and Montrose Avenue on the west in St. Louis. Atlantic Street, from which the yards adjacent to it take their name is two blocks in length, lying immediately north of and parallel with the tracks between Ewing

and Montrose Avenues. Atlantic yards is one of four connecting yards. Jefferson yards are on the east, Rankin yards on the west and Compton yards generally to the north of the Rankin yards.

At 1 o'clock on the morning he was killed Mulcahy had been directed by his superior to go to the Rankin and Compton yards after 4 o'clock to give them the "once over" in place of the watchman regularly assigned there. After he had completed this his work would require that he return to the Atlantic yards for his usual duties, one of which, under a standing order, was protecting an interstate coal train which was due in the lower end of the yards in the course of the early morning. About 4 o'clock that morning in the course of a conversation between Mulcahy and the yard foreman when the two happened to meet near Ewing Avenue, Mulcahy had stated that he had to go "to the west end" and had "headed towards Compton."

Shortly after 5 o'clock his dead body was found lying in Atlantic Street at a point 100 feet west of Ewing Avenue. Death had been caused by a gun shot wound. There were no other marks of violence on the body, and there were no powder burns about the wound. The body was lying with the head towards the east and the feet towards the west. His pistol, unfired, was in the holster and his night stick was lying underneath him on the ground. His effects were found on his person but no wallet or money were found in his clothing or later in his locker. Two persons residing in the vicinity testified they had heard a shot about 5 o'clock that morning, but heard no outcries. The record is silent on the motive for the killing, nor was there any direct evidence as to what Mulcahy was doing upon Atlantic Street at that moment.

The respondents found that it was not only a legitimate but a reasonable and persuasive inference that Mulcahy, having completed his inspection of the Compton and Rankin yards toward which he had been "headed" one hour earlier, was returning to the Atlantic yards by way of Atlantic Street—one of the routes he might have selected to reach the destination—for the purpose of performing his usual and regular duties in that portion of the premises of the railroad. They point out that Mulcahy's duties with respect to interstate and intrastate commerce were not practically separable at any time; that during his hours of work there were no periods of intermission between jobs or between classes of employment; and that all the instrumentalities he inspected and guarded were employed in interstate commerce. They held that he was employed in interstate commerce within the meaning of the act at the very moment of his death and as the same conclusion was reached on competent evidence by the Workmen's Compensation Commission, it was not only binding on the respondents but also served to take the case outside the application of the State Compensation Act.

70

In their opinion the respondents found the question for decision by them was whether there was a substantial basis in the evidence for the Commission's finding that the case fell within the purview of the Federal Employers' Liability Act. In determining this question they applied the test settled by the United States Supreme Court in Shanks v. Delaware, L. & W. R. Co., 239 U. S. 556, 36 Sup. Ct. 188, 60 L. Ed. 436, which is: whether the employee at the time of his injury was engaged in interstate transportation or in work so closely related to it as to be practically a part of it. They said: "In other words, neither the character of the employment generally, nor its actual or anticipated character at some time other than that of the injury, is of itself determinative of the question of the application of the act, but instead the test is whether or not the employee was engaged in interstate transportation within the meaning of the act at the very moment the injury was received." This test, since its establishment by the United States Supreme Court, has been the guide of this court. However in applying it each case must necessarily stand on its own bottom.

The relator claims that the respondents' finding that Mulcahy was engaged in interstate commerce within the purview of the act at the time of his death is in conflict with our controlling decisions especially since that fact was not affirmatively and specifically proved but was based on inference. The cases relied on offer no support for relator's claim. In Benson v. Mo. Pac. R. R. Co., 334 Mo. 851, 69 S. W. (2d) 656, the employee was an assistant general yard master. He was injured by the explosion of a heating stove in which he was building a fire in order to warm his office. We held that the act did not apply because at the time of his injury he was not engaged in interstate transportation, his usual work in interstate transportation being for the moment completed. In State ex rel. M., K. & T. Ry. Co. v. Shain, 343 Mo. 691, 124 S. W. (2d) 1141, we denied certiorari because the employee was carrying records of past movements of freight cars which had ceased to be in interstate commerce and therefore he was not so engaged as to be within the act. In Drew v. Mo. Pac. Ry. Co., 340 Mo. 321, 100 S. W. (2d) 516, we found that the work of repairing a water crane was not so closely connected with the interstate transportation that an employee doing such work would be included in the act. In Bell v. Terminal Railroad Assn., 322 Mo. 886, 18 S. W. (2d) 40, we held that a fireman who was injured after being relieved from immediate duty and on his way for further orders was not under the act and found that such fact was conceded.

In none of these cases was there any general rule announced different from the one followed by the respondents and in none is there such a similarity of facts which would be determinative of this case as presented to respondents. Nor do any of them hold that in determining the character of the work at the time of injury proof of posi-

tive facts only may be considered and inferences must be disregarded. No ruling of this court is pointed out excluding from the liability act a track-walker who inspects tracks used both in interstate and intrastate commerce.

The relator also claims that the respondents in arriving at their decision based inferences upon inferences in conflict with our decision in Cardinale v. Kemp, 309 Mo. 241, 274 S. W. 437. That case has been distinguished in the later case of Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S. W. (2d) 125, which holds that the rule against piling inferences is not a general rule applicable to all situations but is a rule of reason governing only when the proven facts and their reasonable implications furnish no basis for the establishment of the fact sought to be proved. Any number of inferences may be drawn in a given case so long as each has a factual foundation. The same fact may raise several concurrent inferences. It is our opinion that the respondents did not offend the rule announced in Cardinale v. Kemp, supra, but if it can be said they did there is no conflict because that rule has been modified by the later decision with which respondents' ruling is in harmony.

In seeking our writ of certiorari the relator claims that respondents' opinion conflicts also with certain decisions of the United States Supreme Court. Assuming that it does such fact would furnish no ground for our writ. In certiorari to a Court of Appeals in this type of case we are limited to the sole issue of conflict with our latest rulings. The Constitution under Amend. 1884, Art. VI, Sec. 6, provides that "the last previous rulings of the Supreme Court on any question of law or equity shall, in all cases, be controlling authority in said courts of appeal." Then in Section 8 it also specifically gives the Supreme Court superintending control over the Courts of Appeal by certiorari. In this way accord in the rulings of a Court of Appeals with the rulings of this court may be kept and harmony in the decisions of the various appellate courts of the State may be preserved. There is no general power of review of a Court of Appeals' decision by this court. Within its jurisdiction a decision of a Court of Appeals is final. We have no power to consider the correctness of its ruling on the merits. In determining conflict with this court we are necessarily limited to our own rulings. If the respondents have failed to follow or have misconstrued the rulings of the United States Supreme Court and in doing so have made no conflict with our rulings we cannot interfere. In such a case the United States Supreme Court may correct the error by its writ of certiorari.

There being no conflict with our last previous rulings our writ herein is dismissed. All concur.