MABEL MARIE BURNS, RESPONDENT, v. PATRICK H. JOYCE AND LUTHER M. WALTERS, TRUSTEES FOR THE CHICAGO GREAT WESTERN RAILROAD COMPANY, A CORPORATION, APPELLANTS.—161 S. W. (2d) 655.

Kansas City Court of Appeals.   April 6, 1942.

Rehearing Denied May 4, 1942.

*Ernst & Williams* and *Walter A. Raymond* for respondent.

728

*Brown, Douglas & Brown* and *DuBois & Miller* for appellants.

BLAND, J.—This is an action for wrongful death. There was a verdict and judgment in favor of plaintiff in the sum of $3000, and defendants have appealed.

The suit was brought by the plaintiff, the widow of John Edward Burns, to recover for his death, which was caused by his being struck and run over by one of defendants' northbound trains on a public highway crossing about a mile and a. half or two miles north of the village of Parnell.

Defendants' tracks run north from Parnell to the crossing in question and are straight and level. The crossing can be seen plainly from Parnell during daylight. The home of deceased and his family was located to the west side of the railroad tracks and near thereto and about three or four hundred yards north of the crossing. South of the crossing, and on the east side of the tracks about 1461 feet south of the planks on the crossing, there is a whistling post. Between deceased's residence and the crossing there was a wagon bridge on the highway and a railroad bridge in the tracks. A public highway extends to the north from Parnell. It intersects the railroad tracks at a point where the crossing in question is located. The public road south of the crossing lies to the east of the tracks and as

it approaches the crossing from the south it goes over the tracks at an angle and proceeds on north to the west of the tracks. There are board planks at the crossing thirty-two feet five inches in length. They lie at an angle with the tracks in order to conform to the road in its passage over the tracks. Vehicular traffic cannot pass over the tracks except on the planks. There is a heavy growth of weeds and brush extending south from the planks in the crossing over the entire right of way except between the tracks, themselves, and a narrow strip of cinders along the end of the ties. There is no traveled roadway or footpath through the weeds and brush. It is hard to walk through them. Nine out of ten people traveling along the right of way walk on the tracks. The others walk on the cinders at the end of the ties. Use of the right of way as a footpath is a common occurrence. Deceased frequently used it in going to and from Parnell. The crossing is a much used one. The tracks as they approach the crossing from the south are built on an embankment. The gauge of the track is 56½ inches. The overhang of the locomotive involved in the collision is eighteen inches on each side. The ties are eight feet in length.

Deceased, a man forty-eight or forty-nine years of age and in good health, met his death on September 5, 1941. On that day he was engaged in building a corn granary in Parnell. He left home about 6 o'clock A. M. to go to work that morning. He carried his lunch in a syrup bucket. He wore a hat but no coat.

Plaintiff's witness, New, testified that he lived a block west and not quite a block north of defendants' depot in Parnell; that about 6:54 P. M. of the day in question he saw deceased coming from the end of the produce house and go north on the tracks with his dinner bucket in his hand; that he watched him, he would say, five minutes; that the last time he saw deceased the latter was probably half of a quarter up the tracks; that about twenty-five or thirty minutes thereafter he saw a northbound freight train, described as the meat train, go through Parnell; that this train comes through Parnell about 7:10 P. M. This was the first train over the tracks after deceased was seen walking northwardly upon the tracks. New was the last person to see deceased alive. New further testified that the meat train went through about dusk; that at that time a man walking on the tracks could be seen for approximately a half a mile.

There was evidence that the day in question was a nice, warm, clear day; that the meat train on the day in question passed through Parnell at 7:10; that it passed over the crossing in question about 7:13 P. M., and that it gave no warning of its approach to the crossing.

Ordinarily deceased arrived at his home at the end of his day's work about 7:30. On this particular evening he was expected between 7:00 and 7:30 for supper with his family. The family waited on this particular evening but he did not come home. The

next morning about 7:00 A. M. defendants' section crew discovered his dead body north of the crossing planks.

According to the testimony of the engineer and fireman, witnesses for defendants, the train approached the crossing at a speed of forty or forty-five miles per hour. They were in their proper positions on the engine and in a position to see ahead. It was dark enough for the train to have its lights on. With the aid of the lights they could see a man on the tracks or right of way for a distance of at least 800 feet. However, on account of the position of the engineer and fireman in the cab seventy feet back of the front end of the locomotive their view in front of the locomotive was obstructed the first 120 feet ahead of it. Both of them testified that they were waching the crossing but saw no one on it or approaching it. They testified that the whistle on the engine was blown at the whistling post. They also stated that the locomotive bell was ringing, the automatic bell ringer having been started when they left St. Joseph; that the train could have been stopped within 1600 to 1800 feet; that when the train reached Des Moines a routine inspection was made of the locomotive engine and there was no evidence upon it of it's having struck a man or an animal; that the next day the engineer received word that a train had struck deceased at the crossing and he examined the engine and found nothing on it to indicate that it had struck anything; that had it struck a man there would have been evidence on the engine of the collision.

The engineer testified that the pilot was four inches above the rails and nine inches above the ground; that if a person in the center of the track were struck by the engine he would be carried by the pilot two or three seconds before he would fall to the ground; that if the side of the pilot struck him he immediately would be thrown away from the tracks.

Plaintiff's evidence tends to show that on the morning of September 6th, there was blood on the fourth or fifth tie south of the planks and about five feet south of the south end of the planks on the crossing; that the place where the blood was "looked like there had been something hit there . . . a hard lick and blood left on the tie." There was no blood south of this point. One of defendants' witnesses testified that he saw tobacco scattered around this blood and that an empty tobacco sack was at that point. Deceased's pipe and pencil were found at the south end of the second or third crossing plank. His pocket knife, entrails, blood and hair were found along the crossing planks. His shoe was found on the road just north of the crossing planks. The main part of his body was found between the rails ninety-three feet and six inches north of the crossing planks. His hat was found on the west side of the tracks about 100 feet north of the planks. His dinner bucket was found on the west side of the tracks 116 feet and eight inches north of the crossing planks. The lid

of this bucket was found 140 feet north of the planks and on the west side of the tracks. There was a piece of bone embedded in one of the ties north of the dinner bucket and of the crossing planks. Deceased's suspenders were found two-thirds of the way to the bridge and were badly frayed. One of his legs was found at the railroad bridge about 819 feet north of the crossing planks. His body was flyblown.

A northbound passenger train went through Parnell about 8:30 of the evening in question, approximately an hour and a quarter after the meat train. A motor went through at 4:30 and a passenger train at 6:30 the next morning.

There was no eye-witness to the accident. The case was tried wholly on circumstantial evidence.

The case was submitted to the jury by plaintiff solely upon the humanitarian theory. Plaintiff's main instruction submitted actual and constructive notice to the operators of the train that deceased was in a position of peril on the crossing when they saw or could have seen him there in that position and in time, by the exercise of ordinary care, to have sounded the whistle and warned him of the approach of the train.

It is insisted that defendants' instruction in the nature of a demurrer to the evidence should have been given for the reason, among other things, that there was no evidence that deceased was upon the crossing in front of the engine at a place where the engineer or fireman could have seen him there in time thereafter to have taken any action to avert the collision. It may be inferred from the testimony that deceased was struck by the meat train about five feet south of the planks on the crossing. There is some slight evidence of probative value that the place where he was struck was within the public crossing right of way, though not on the planks thereon. However, there is no substantial evidence that the public crossing extended any farther south than the place where he was struck.

Deceased was a trespasser upon defendants' tracks or right of way before he crossed the line of the public crossing and defendants owed him no duty to keep a lookout for him prior to that time. [Cochran v. Thompson, 148 S. W. (2d) 532.] There is no evidence of any survey having been made to locate the boundary lines of the public crossing in question. There was evidence that there was a fence to the west of the highway and to the east of the railroad tracks coming from the south (the highway and tracks were not parallel at this point), which ended several feet south of the east rail of the tracks, and that a line drawn from the end of this fence extending straight ahead toward the north from that point to the east rail of the tracks would cross that rail at a point fifty-four feet south of the south end of the planks in the crossing. There was also a fence

to the east of the railroad north of the crossing planks which ended at or near the tracks 117 feet north of the planks.

Plaintiff contends that the highway right of way extended south of the planks on the crossing a distance of fifty-four feet. There is no substantial evidence of this. It is true that the evidence shows that the fence south of the planks was called "the right of way fence" and it had been there for more than ten years. Why it was not built any farther toward the north is not shown. As before stated, the railroad and the highway were not parallel at this point, yet, plaintiff contends that this evidence shows that the highway line ran straight up to the east rail of the track at a point fifty-four feet away from the place where the used part of the highway crossed over the tracks. Under the circumstances, to say that under this evidence the highway line crossed the tracks at this fifty-four foot point would be indulging in mere speculation. It follows that there was no substantial evidence that the public crossing extended southwardly any further than the place where deceased was struck.

Plaintiff was not only under the duty of showing that deceased was upon the crossing when run upon, but that he was observable there by the engineer and fireman, while exercising due care to that end, and for a sufficient length of time and at such distance as to enable them to avert the collision through prompt action with the means at hand for that purpose. [Whitesides v. Railroad, 186 Mo. App. 608, 619.] There was no evidence tending to show these facts. Plaintiff's position as to this matter is stated in her brief as follows:

"Here the trainmen could not wait until they were on the crossing before they looked for persons thereon. They were under the duty to look far enough back to make looking effective. If they had done so, *they could not have failed to see deceased walking down the track with his back to the approaching train.*" (Italics ours.)

In this connection plaintiff cites cases holding that it is the duty of operators of railroad trains, not only to watch a highway crossing but to watch for persons upon the highway approaching the crossing and near thereto and oblivious of the danger of the approaching train.

These cases have no bearing upon the present one for the reason that, as before stated, deceased was a trespasser upon defendants' tracks until he crossed over the line of the right of way, and defendants cannot be held for any neglect upon their part to observe deceased before he left this point. Plaintiff does not claim that either the engineer or the fireman actually saw deceased and deliberately ran over him, but urge that there is sufficient in the record to raise the inference that, if they looked at all, they did not look carefully and failed to see him through their negligence. On first blush it may seem anomalous to say that the engineer and fireman were required to keep a lookout for those approaching the tracks on the highway and, had they done

so, they would have seen deceased approaching the crossing, as he would have been within their view, if he was on the tracks, yet, nevertheless, they cannot be held negligent for not seeing him. However, in this case we are concerned with the legal effect of a failure of defendants to perform an alleged duty, that is, to look, or to look carefully, and whether they are to be held for a failure to so look depends upon the duty that they owed to the deceased at the time, and that duty, so far as relates to the question of observing him approaching the line of the crossing, is different from that they owed to persons approaching the crossing upon the highway. Defendants were under no duty to anticipate that deceased, or anyone else, would trespass upon their tracks or right of way while they could not assume that one traveling upon the highway would not approach the tracks. There are many instances where one way be responsible for an injury suffered by one person and not another happening under the same or a similar state of facts, with the exception of the duty owed to each. For instance, the owner of property may be responsible for an injury to a business invitee upon his premises and not a gratuitous invitee where the two are injured in the same manner and under the same circumstances. [Restatement of the Law of Torts, secs. 342, 343.]

Plaintiff, in her main instruction recognized that the duty of defendants' servants, in reference to looking, was confined to discovering deceased upon the crossing and not discovering him prior to his reaching that point, and the case was tried on the proper theory in this respect.

There are other reasons why plaintiff did not make out a case for recovery. There is no evidence as to what deceased was doing at the time, or immediately before, he was struck by the train. Even assuming that there was substantial evidence that the crossing extended to a point fifty-four feet south of the crossing planks or that it was the duty of the trainmen to observe deceased before he reached the crossing and while he was approaching it, there is no evidence that he was in a position of peril in front of the engine a sufficient length of time to have been seen by the engineer or the fireman in time, thereafter, to enable them to have averted the collision.

Plaintiff's theory in regard to this matter is stated in her brief as follows:

"The track was elevated a little above the surrounding country. Grass and weeds grew beside the track, making it difficult to walk along there and the undisputed testimony shows pedestrians walking on the track almost exclusively at this point for the reasons mentioned. Deceased had had so short a time to get where he was struck from the time he was last seen, that it is apparent he must have walked straight ahead without stopping or loitering in the weeds along the right-of-way as counsel for appellant like to speculate, although there is not a scintilla of evidence in the record to support them. . . .

"The jury was warranted in finding that plaintiff (deceased) walked down the middle of the track with his back to the approaching train. Deceased was where two steps would have taken him beyond the overhang of the train and out of danger. Stepping or jumping four feet to the side would have put deceased out of danger. With the ability to see deceased for at least a quarter of a mile or 1,320 feet, it took the train 27½ seconds to travel that distance. Within a second or two thereafter deceased would have been out of danger. The trainmen testified that they were at their posts ready to act. The whistle could have been blown in a second of time and in two seconds more deceased would easily have been out of danger and his life would have been saved. Clearly the issue was for the jury.

"As heretofore pointed out defendants' engineer and fireman testified they could see 800 feet. Treveling 40 miles per hour that would require 11½ seconds to traverse which would be ample time to warn deceased and allow him to get in the clear. As pointed out above 3 seconds of time would have been sufficient to save the life of plaintiff's husband. . . .

"Deceased could not have reached the place where he was struck unless he walked right along without any delays or side-excursions. The sides of the track were rough, weedly and sloping so that it is highly improbable he walked any place than on the tracks from the time he was last seen walking on the track and he was in the middle of the track when struck. His back was to the train so his obliviousness was apparent for about the same distance he could be seen. The engineer and fireman testified they were at their posts looking ahead and in a position to see and act in the shortest possible space. Their testimony they were at their posts may be believed without also believing they looked diligently and did not see deceased walking down the track."

There was evidence that when deceased was last seen a mile and a quarter or a mile and three-quarters from where he was struck, he was walking in the middle of the tracks and it also may be inferred that he was between the rails at the time he was struck. What he did between those two times is left wholly to speculation. There is some evidence tending to show that if deceased was walking from Parnell to the place of the collision at his usual gait he would cover the distance in twenty-seven minutes. The Supreme Court has held that the ordinary walking speed of an individual is two or three miles per hour. [McGowan v. Wells, 24 S. W. (2d) 633, 639.] However, there is no evidence that deceased was walking at any time at any his usual gait, or any other gait. There is no evidence concerning this with the exception of that of plaintiff's witness, New, who testified that deceased covered the space of a half of a quarter of a mile in five minutes. In other words, deceased covered a distance of 660 feet in five minutes. If he had continued at this rate of speed to the

crossing, and the crossing was a mile and a half from Parnell, it would have required him an hour to have covered the distance or, if the distance was two miles, an hour and twenty minutes. So it is apparent that if he covered the first 660 feet in five minutes, he walked much faster after that time because he was struck approximately twenty-seven or twenty-eight minutes after he left Parnell. No doubt, the evidence of the witness, New, was based upon estimates, but it exemplifies the fact that no one knows as to what deceased's rate of speed as he approached the crossing. He may have covered the entire distance in a much less length of time than twenty-seven or twenty-eight minutes and when he arrived at the place near where he was afterwards struck by the engine, he may have gone momentarily a short way from the tracks to answer a call of nature and returned to the tracks in such a manner and position as to have rendered it impossible for the engineer and fireman to have seen him in time to have done anything to avert the collision, had they been looking carefully. While there were weeds and brush on either side of the tracks, there was no evidence that these constituted an impenetrable jungle. The evidence as to what occurred immediately prior to the time deceased was struck is left wholly to speculation. [Whitesides v. Railroad, *supra*; Hamilton v. Railroad, 250 Mo. 714; Justus v. St. L.-S. F. Ry. Co., 224 S. W. 79; Newell v. Dickinson, 207 Mo. App. 369; George v. Mo. Pac., 213 Mo. App. 668.]

Plaintiff contends that the cases just cited are no longer to be followed for the reason that the Supreme Court has lately changed the rule prohibiting the building of an inference upon inference, citing in support thereof State ex rel. v. Hostetter, 346 Mo. 65; Morris v. Du Pont de Nemours & Co., 341 Mo. 821. These cases do not hold that the triers of the fact may, in every instances, base an inference upon an inference, but may do so if the particular facts of the case warrant it; that inferences can be piled one upon another so long as the evidence does not become too remote and the matter enter into the field of speculation. A basing of a single inference upon another may well project the matter into the field of conjecture, and often does. We do not think that the cases cited by plaintiff weaken, in any respect, the holding in the cases cited by us. They certainly do not expressly overrule them and we do not think that they even inferentially do so.

We have examined Allen v. Chi. R. I. & Pac. Ry. Co., 227 Mo. App. 468, and like cases, cited by plaintiff and find the facts in those cases wholly unlike those in the case at bar.

The judgment is reversed. All concur.