Thurman HOUSTON, Respondent,

v.

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, Appellant.

No. 55767.

Supreme Court of Missouri, Division No. 1.

Jan. 10, 1972.

Barkley M. Brock, Julius F. Wall, Clinton, for respondent, Thurman Houston.

David R. Odegard, Robert L. Wehrman, James & McCanse, Kansas City, for appellant, Chicago, R. I. & P. R. Co.

HIGGINS, Commissioner.

Action by surviving husband for $50,000 damages for wrongful death of wife and for $3,260 damages for destruction of automobile. Plaintiff had verdict and judgment for $20,000 damages for wrongful death and $3,200 damages to personal property.

Plaintiff's wife, Pearl Houston, was killed when the 1969 Chevrolet Impala sedan she was driving collided with defendant's train at a grade crossing of State Highway D in Bowen, Missouri, at about 6:00 p. m., May 24, 1969. The sole ques-

tion is whether, as contended by appellant, the court erred in failing to direct a verdict for defendant at the close of plaintiff's case on the ground Mrs. Houston "was guilty of contributory negligence as a matter of law in failing to have her auto under the control necessary to permit her to stop short of the [railroad] tracks."

Trooper Gary Price of the Missouri State Highway Patrol investigated the collision, arriving at the scene at 7:08 p. m., May 24, 1969. The day was clear; the weather was dry. Present at the scene were the engineer, conductor, and a couple of passengers from the train, and some local people. Involved in the collision were the car driven by Pearl Houston and "Rock Island Railroad train Extra No. 1205." The railroad track ran "approximately east and west," and Route D, a bituminous road twenty feet wide, crossed it at a northwesterly angle of about 45 degrees. The road sloped to the right and had a slight upgrade as it approached the tracks.

The train, with eight cars, which had been traveling from west to east, was sitting east of the crossing. The car was sitting "approximately 111 feet south and to the east of the railroad crossing on Highway 'D' in the northbound lane." The train showed damage "on the front steps on the right side and part of the cowcatcher. * * * Right at the front of the train on each side there are steps that go up to * * * [a] catwalk. * * * The steps had been bent and tore loose. * * * this portion would be actually in front of, I guess what you would call the boiler." To the car "the heaviest damage was on the right side, but the whole front end was destroyed." An exhibit showed the damage to extend to the right side to include both right-hand doors.

Trooper Price "found approximately 78 feet of skid marks that appeared to be her braking action. These were in the northbound lane leading back from the railroad track, back to the south and east." The

skid marks indicated to him that Mrs. Houston saw the train at least some distance back of their starting point. Trooper Price made an examination of the crossing and the right of way to the immediate left of Mrs. Houston as she approached the crossing and the direction from which the train came. "There were brush and trees and growth both along the highway right-of-way and the railroad right-of-way." The brush and trees constituted an obstruction to her view and it ran up to 14 feet in height. He thought that a person traveling northwesterly on Highway D would not see a train to the west sooner than 100 to 150 feet southeast of the crossing. The obstruction "didn't go right up to the actual track but it appeared * * * it grew right up to where the gravel would start * * * that the railroad would put down to be a bed for its track."

Trooper Price noted two signs near the crossing, one approximately 50 feet southeast of the tracks, the other approximately 500 feet from the tracks. Exhibits showed the closer sign to be a typical railroad crosspiece-type sign, and the more distant sign to be a round highway-type sign. There was also a railroad crossing warning painted on the highway surface 300 or 400 feet from the crossing.

James Pope lived about a quarter mile west of the point where Highway D turned sharply to the right from its generally east-west direction to go northwesterly across defendant's tracks. His house was also about a quarter mile south of the tracks and was on ground higher than the tracks. Everett White's house was directly north across a county line road and Mr. Pope could see trains on defendant's tracks after they passed Mr. White's house, and the crossing would then be a quarter mile to the east. About 6:30 p. m., May 24, 1969, Mr. Pope and Russell and Eula Ball were visiting on Mr. Pope's patio when they heard a noise. "* * * we just looked over and we saw the train going east, stood there and watched the train just a little bit." There followed a

wreck at the crossing, and, although train whistles and bells could be heard at his place if they were sounded, this train sounded neither whistle nor bell as it approached the crossing. Mr. Pope also noted the obstruction by way of brush and trees and had not known it to have been cut in the three years prior to the collision. He felt a motorist would have to get as close to the crossing as 60 feet before he could get a clear view of the tracks and trains approaching from the west.

Russell Ball also heard and saw the train as it passed James Pope's house and it did not sound bell or whistle as it approached the crossing. He went to the accident scene and observed, "* * * you had to be within about 50 or 60 feet of the railroad before you could see anything coming down the railroad."

Eula Ball also saw and heard the train, but heard no warning signals.

Bernice Pope could always hear defendant's trains when they sounded warnings for the Highway D crossing. On the occasion in question, however, the train sounded neither bell nor whistle.

Dennis Cooper also lived on the county line road almost due south of the crossing and a little west of the curve to the northwest made by Highway D. He heard no bell or whistle prior to the collision at the Highway D crossing. He found that he could see west "probably 60 feet down the tracks" from approximately 75 feet southeast of the tracks. In order to see as far as 300 feet down the track, "you would have to be almost on top of it. * * * You might be able to see a hundred feet down if you was 20 feet from it, maybe."

Mae Brown lived in a trailer home just east of Mr. Cooper. She had heard the defendant's train whistle "sometimes," but heard no whistle on the occasion of Mrs. Houston's death until after the collision.

Johnny Lee Nations lived just east of Mrs. Brown. He was eating supper when the collision occurred, and he heard no bell or whistle prior to the noise of the collision.

Thurman Houston, age 58, had lived with his wife, age 54, since their marriage in 1931, and at their farm four miles east of Leeton since 1936. The automobile involved in the collision was about 30 days old and had around 930 miles on it. He valued it at $3,200 and it was demolished in the collision. Mrs. Houston was in good health and performed chores and tasks usual to being a farm wife. Mrs. Houston passed through the crossing on Highway D on an average of "once every two weeks."

Mrs. Houston's death as a result of the collision was admitted.

Defendant stood on its motion for directed verdict. Plaintiff's case was submitted on defendant's negligent failure to sound whistle and bell as required by Section 389.990, V.A.M.S., and there is no question of the sufficiency of evidence to support that submission. The defense of contributory negligence was submitted in the disjunctive failure to keep a careful lookout or driving at an excessive speed, and the jury resolved that issue favorably to plaintiff.

Appellant's argument is that the evidence shows conclusively that Mrs. Houston was aware of the crossing and was warned of same; that the skid marks show that Mrs. Houston had the ability to observe the train at some point short of the track; that she was driving at an excessive speed so as not to have her vehicle under control to stop short of the tracks and, ergo, she was contributorily negligent as a matter of law.

To support his argument, appellant cites the well-known propositions: that the duty of the traveler approaching a crossing to use all reasonable care and caution exists despite any failure of the railroad in the performance of its duty to signal, Stepp v. Chicago, R. I. & P. Ry. Co., 85 Mo. 229, 235; that the contributory negligence of

an injured party defeats his right to recovery even though the railroad may have been negligent in failing to signal, Whitesides v. Chicago, B. &. Q. R. Co., 186 Mo. App. 608, 172 S.W. 467, 469[1], Borrson v. Missouri-Kansas-Texas R. Co., 351 Mo. 229, 172 S.W.2d 835, 846[5]; that a driver's view is obstructed in no way relieves his duty of care to stop, look, and listen at a time and place where it will be effective to do so, Rischeck v. Lowden, 347 Mo. 426 147 S.W.2d 650, 652[2]; that a railroad track itself is a warning of danger, Pipes v. Missouri Pac. R. Co., Mo., 338 S.W.2d 30, 35[5–7]. See also Silvey v. Missouri Pac. R. Co., Mo., 445 S.W.2d 354, 360[6].

As with all such cases, there are differences in facts; but on this record Zumault v. Wabash R. Co., Mo., 302 S.W.2d 861, is controlling. Several factors are common to both cases, and in that case several other equally well-known rules were recited in the light of which the factors were considered:

"* * * The burden of proving * * * contributory negligence was on the defendant. The plaintiff was not obliged to prove * * * that [his decedent] was in the exercise of due care for [her] own safety. * * * Before the court can declare that contributory negligence is shown as a matter of law, such negligence must clearly appear from admitted or conclusively proved facts. If reasonable men may honestly differ with respect to the inferences to be drawn from such facts, then the question whether the driver exercised the care required for his own safety is for the jury. Monroe v. Chicago & A. R. Co., 280 Mo. 483, 219 S. W. 68, 71. * * * plaintiff's evidence must be considered as true and he must be given the benefit of any and all reasonable inferences therefrom and the aid of any evidence offered by the defendant which is favorable to him. In order for the defendant to maintain its position * * * it must show that the evidence, even when considered most favorably to the plaintiff, unequivocally establishes * * * con-

tributory negligence." 302 S.W.2d 1. c. 862, 863[1–3].

The court then noted the physical surroundings and testimony and from these the factors were selected. Among those factors was that after the driver passed a point 40 feet north of the tracks at which he could see 1,000 feet to the west, his view was again obstructed by weeds and brush. The train was late, traveling at high speed. The automobile was traveling slowly at 10 miles per hour when 10 to 15 feet from the track. Sight distances and other measurements were not indisputably established. As to control, the plaintiff was driving at a lawful, reasonable speed, and "the mere fact that plaintiff did not stop his automobile before it fouled the track does not justify the conclusion as a matter of law that he was not exercising the degree of care imposed by law upon the operator of a motor vehicle. * * * Such fact must be considered with all of the other evidence in the case." 302 S.W. 2d 1. c. 865[7]. The crossing itself was noted, a narrow single lane for vehicular traffic.

■ Similarities and factors of the present case common to Zumault v. Wabash Ry. Co., supra, are readily noted: Brush and weeds obstructed Mrs. Houston's view to the west, the direction from which the train came, as she approached the crossing, to the extent that her view down the tracks was variously estimated at 100 to 150 feet at a point 100 to 125 feet from the tracks; 50 to 75 feet from 50 to 75 feet from the tracks; 100 feet from 20 feet from the tracks; and 300 feet from right on the tracks. The train was an extra and, at any speed, was, therefore, unusual, and reduced the effect of Mrs. Houston's knowledge of the crossing and bore on her duty to maintain a lookout. Similarly, there is no direct evidence of Mrs. Houston's speed and, while 78 feet of skid marks indicate a speed in excess of 10 miles per hour, such is not, of itself, evidence of excessive speed; there was no evidence adduced to relate such skid to speed; sight distances were esti-

**8**

mates as opposed to indisputable measurements; and the photographs show that Mrs. Houston had just negotiated a sharp curve to her right prior to approaching defendant's tracks. Such evidence is not conclusive of excessive speed; and, as stated in Zumault v. Wabash, supra, the fact plaintiff failed to stop prior to reaching the track is not conclusive of a lack of due care when considered with all the evidence favorable to plaintiff. The crossing was in a rural area; was made by a local, narrow highway; and the skid marks and vehicle damage show that the decedent became aware of the train and attempted to stop, as opposed to slamming heedlessly into a train occupying a crossing. And, finally, it is conceded that no warning was sounded in accordance with statutory requirements; and so, without further demonstration, as in Zumault v. Wabash, supra, 302 S.W.2d l. c. 866, "under the facts and circumstances in evidence * * *, the determination of whether [plaintiff's decedent] was guilty of contributory negligence was for the jury and not the court." See also Roques v. Butler County R. Co., Mo.App., 264 S.W. 474, 477[5]: "The traveler can rely upon the statutory signals being given where his view is so obstructed that he cannot by the exercise of due care see an approaching train. If the traveler can hear and listens, and hears no signals and no sound of an approaching train, and cannot by the exercise of due care see an approaching train because of obstructions, then he is not required to leave his vehicle, and go forward on foot to ascertain if a train is approaching, but in such case he may proceed relying upon and depending upon the statutory signals being given."

Appellant relies principally on Pipes v. Missouri Pac. R. Co. and Silvey v. Missouri Pac. R. Co., supra. However, in Pipes v. Missouri Pac. R. Co., plaintiff's guest testified to circumstances which left no alternative than the conclusion that heedless of a lighted crossing and a lighted engine plaintiff either timely saw or failed to look for a train and, in either event, was guilty of contributory negligence when he drove onto the crossing at 1:40 a. m.; and in Silvey v. Missouri Pac. R. Co., the court said by dicta only, because it held there was a case based on failure of a flashing light signal, that it would have held plaintiff contributorily negligent as to defendant's failure to give statutory warnings.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All of the Judges concur.